Emily E. Howe, State Bar No. 293964
LAW OFFICES OF EMILY E. HOWE
405 Via del Norte, Ste B
La Jolla CA 92037
Telephone: (619) 800-6605
Email: emh@howelaws.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF JOHN PANTOJA, by and through its successors-in-interest AMADO PANTOJA, individually and as successor in interest, MARIA DE LOURDES VERA, individually and as successor in interest, to John Pantoja.<br><br>      Plaintiff(s),<br><br> vs.<br><br>JEFFREY LYNCH, individually & in his official capacity as warden, KATHLEEN ALLISON, individually and in her official capacity as past Secretary of CDCR, Secretary of CDCR, JEFFREY MACOMBER, individually and in his official capacity as Secretary of CDCR, CSP Officer C. CAVANAUGH, California State Prison ("CSP"), CSP Officer C. Colvin, Registered Nurse Lori Chester, CDCR Investigator Erik Altvater, DOE Licensed Technician, DOE Registered Nurse Hunter, DOE Yang, Wong, Phun, and DOES 1-50, inclusive in their official and personal/individual capacities,<br><br>      Defendant(s). | Case No.: 2:24-cv-01709-JDP<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES PENALTIES AND INJUNCTIVE RELIEF**<br><br>**Jury Trial Demanded.**<br><br>(1) Excessive Force<br>(U.S. Const. Amend. VIII; 42 U.S.C. § 1983);<br>(2) Deliberate Indifference-Failure to Protect (U.S. Const. Amend. VIII; 42 U.S.C. § 1983);<br>(3) Assault<br>(4) Battery<br>(5) Tom Bane Civil Rights Act<br>(Cal. Civ. Code § 52.1);<br>(6) Americans with Disabilities Act and Rehabilitation Act (U.S. Const. Amend VIII; 42.U.S.C§1983); (42 U.S.C. § 12101, *et seq*.);<br>(7) Deliberate or reckless suppression or interference with evidence<br>(8) Unwarranted Interference with Familial Association (Cal. Const. art. I § 7(a)); (8)s; (42 U.S.C§1983)<br>(9) Wrongful Death<br>(Cal. Code Civ. Proc. § 377.60).<br>(10) Interference with Familial Association U.S. Const. Amend. XIV; 42 U.S.C.§ 1983);<br>(11)Negligence<br>(12) Intentional Infliction of Emotional Distres<br>(13) Failure to Provide Medical Treatment / Deprivation of Medical Care<br>(14) *Monell* Supervisory Liability Causing Constitutional Violations (Failure to Properly Train, Supervise and Discipline, Ratification (42 U.S.C. §1983) |

Plaintiffs, ESTATE OF JOHN PANTOJA, by and through its successor-in-interest AMADO PANTOJA, individually and as successor in interest, and MARIA DE LOURDES VERA, individually and successor in interest to decedent, by and through their attorney, upon information and belief allege the following:

**INTRODUCTION**

1. John Pantoja ("Johnny" or "Decedent" was the beloved son, brother, and family member of plaintiffs.

2. Johnny had been a 16-year-old indigenous, impoverished student who entered the juvenile detention into California prison system and ended up dead by only age 31.

3. This civil rights action seeks to identify the true facts and seeks accountability of compensatory, punitive damages, and declaratory relief from Defendants for violating various rights under the United States Constitution and state law in connection with the June 17, 2022 death without justification, of 31-year-old John Pantoja while he was in custody of the California Department of Corrections and Rehabilitation ("CDCR") and located at or about California State Prison Sacramento, 100 Folsom Prison Road, Represa, CA 95671.



4. On or about June 16, 2022, Decedent sought help from employees of CDCR in which the clinical review or medical impressions opined blunt-force trauma type injuries, trouble breathing, asthma-like symptoms, cough-respiratory distress, COVID symptoms, severe neuropathic pain/body pain, swelling to his leg, and/or possible partial seizures, but was shortly thereafter, returned to his housing cell. He was later found dead.

5. The autopsies remark: possible "suicide". Given Johnny's plans for reentry his family was startled and baffled by the differing and conflicting reports of his death.

6. By the morning of June 17, 2022, Plaintiffs are informed and believes video shows nearly

twenty-two (22) officers or agents of CDCR encircled Johnny's dead body within minutes and obfuscates the camera.

7. Plaintiffs are informed and believes that Decedent and other inmates, known and unknown, had complained about guards' abuse or mistreatment of himself and other prisoners.

8. Plaintiffs are informed and believes that Johnny and/or witnesses' pleas for help for decedent and were largely ignored. The full extent of Johnny's injuries, the identities of CDCR staff, and circumstances surrounding his death are unknown at this time, as video-reports have not been fully released and the family requests for Johnny's records, writings, and belongings ignored.

## JURISDICTION AND VENUE

9. This is an action for monetary damages brought pursuant to Title 42 of the United States Code, sections 1983 and 1988; and the Eighth and Fourteenth Amendments of the United States Constitution against various correctional employees then working at the California Department of Corrections in Sacramento.

10. This Court has original jurisdiction pursuant to 42 U.S.C. § 1983. Federal jurisdiction exists under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. §1343(a)(3) and (4)(civil rights). This court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C.§ 1367 (a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution. Plaintiffs bring this action under the laws of California, the United States and the U.S. Constitution.

11. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. §1391(b)(2) because the events, acts, or omissions giving rise to the claims occurred in the County of Sacramento in the Eastern District of California.

## PARTIES

12. Before his death, John Pantoja ("Johnny" or "DECEDENT"), an individual and citizen of the United States of America, resided in the City of Sacramento, County of Sacramento, at all times relevant to this Complaint.

13. The Estate is the Estate of decedent John Pantoja. Pursuant to section 377.20 of California Code of Civil Procedure, the Estate has standing to bring claims for torts resulting in decedent's

death. Since Johnny's death occurred in Sacramento, the estate resides in the Eastern District.

14. DECEDENT Johnny Pantoja died intestate. Johnny had no children or spouse.

15. Cal. Civ. Proc. Code § 377.31, provides in pertinent part, "the court shall allow a pending action or proceeding that does not abate to be continued by the decedent's personal representative or, if none, by the decedent's successor in interest.

16. At all relevant times, Plaintiff Amado Pantoja, is and was an individual domiciled in San Diego, County of San Diego, California. Plaintiff Amado Pantoja is the natural father of Johnny Pantoja. Plaintiff Amado sues both in his individual capacity as the father of DECEDENT and in a representative capacity as a successor-in interest to DECEDENT's rights pursuant to Cal. Civ. Proc. Code § 377.30 and 377.60, and who files the declaration by Cal. Civ. Proc. Code § 377.32.

17. At all relevant times, Plaintiff Maria de Lourdes Vera is and was an individual domiciled in San Diego, County of San Diego, California. Plaintiff Maria de Lourdes Vera is the natural mother of John Pantoja. Plaintiff Maria de Lourdes sues in her individual capacity and as a successor in interest to decedent Johnny Pantoja. (*See* Exhibit A)

18. At all relevant times, the California Department of Corrections ("CDCR") is a public entity that receives state and federal funding including from the United States Department of Justice and other federal agencies. CDCR's principal place of business is in California, with its headquarters in Sacramento, California. CDCR is the State of California acting through the agency that operates and administers its policies, practices and procedures against its incarcerated. CDCR is legally required to conduct its activities in compliance with the Americans with Disabilities Act, the Rehabilitation Act, the U.S. Constitution and applicable law.

19. At all relevant times, Jeffrey Lynch is or was the Warden of CDCR. He was informed that day and knew or should have known about the actions, omissions, and alleged cover-up of the officers. In this capacity Defendant Lynch is responsible for the administration of CDCR. Defendant Lynch has ultimate and direct authority over CDCR's policies, practices and procedures and is responsible for ensuring that they comply with all state, federal and relevant law governing employees and person(s) in custody. Specifically, he has the ultimate authority to discipline, terminate, investigate, and transfer correctional staff. He has the ultimate authority to oversee,

review, and approve investigations into grievances and staff complaints. Upon information and belief, Defendant Lynch is a resident of California. He is sued in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on actions, inactions, or conduct taken or performed under the color of state law.

20. At all relevant times, Kathleen Allison was the Secretary of CDCR. She knew or should have known about the actions, omissions, and alleged cover-up of the officers. As the highest-level official, Defendant Allison is responsible for the administration of CDCR. Defendant Allison had ultimate and direct authority over CDCR's policies, practices and procedures and is responsible for ensuring that they comply with all state, federal and relevant law governing employees and person(s) in custody. Specifically, she has the ultimate authority to discipline, terminate, investigate, and transfer correctional staff. She has the ultimate authority to oversee, review, and approve investigations into grievances and staff complaints. Defendant Allison was regularly provided with reports concerning the treatment of mentally ill inmates improper classification of inmates in the prison, prison suicides, and other violations involving the housing, care, mental health care, and treatment of inmates at CMC. Defendant Allison was regularly provided and/or informed of the findings of the Coleman Special Master, and the orders of the Coleman Court, including annual suicide audits. Upon information and belief, Defendant Allison is a resident of California. She is sued in her official capacity (for injunctive and declaratory relief) and in her individual capacity (for damages) based on actions, inactions, or conduct taken or performed under the color of state law.

21. At all relevant times, Jeff Macomber is or was the Secretary of CDCR and is responsible for overseeing the CDCR, California's correctional agency, and participated in the Federal oversight of California's prisons. In this capacity Defendant Macomber is responsible and has authority for the administration and operation of CDCR. Defendant Macomber has direct authority over CDCR's policies, practices and procedures and is responsible for ensuring that they comply with all relevant law. Upon information and belief, Defendant Macomber is a resident of California. He is sued in his official capacity (for injunctive and declaratory relief) and in his

individual capacity (for damages) based on actions, inactions, or conduct taken or performed under the color of state law.

22. At all relevant times relevant to this Complaint, California State Prison ("CSP) Officer C. Cavanaugh is an individual believed to reside in Sacramento County, and/or employed by CDCR. Plaintiffs are informed and believes he was expressly named as part of a CDCR Form 602 complaint about the incident. He was supposed to do regular check-ups. In this capacity he was responsible for assisting inmates, addressing medical requests, maintaining evidence and compliance with all relevant law. Plaintiff is unaware of the proper spelling of Officer Cavanaugh's last name. Plaintiff is informed and believes it is either Cavanaugh or "Cavvanah". Plaintiff is sued in his individual capacity.

23. At all relevant times relevant to this Complaint, California State Prison ("CSP), DOES 1-2 are Registered Nurses Hunter or Chester are individuals believed to reside in Sacramento County, and/or employed by CDCR. In this capacity he was responsible for assisting inmates, addressing medical requests, maintaining evidence and compliance with all relevant law. He is sued in his individual capacity based on actions, inactions, or conduct taken or performed under color of state law.

24. At all relevant times relevant to this Complaint, California State Prison ("CSP), DOES 3-5, Phun, Yang, or Wong are individuals believed to reside in Sacramento County, and/or employed by CDCR. An Officer was responsible for performing medical checks. In this capacity they were responsible for assisting inmates, addressing medical requests, maintaining evidence and compliance with all relevant law. DOES 3-5 had reported but did not actually perform the wellness checks. DOES 3-5 are sued in the individual capacity based on actions, inactions, or conduct taken or performed under color of state law.

25. Upon information and belief, DOES 6 through 10 are medical providers whose actions, inactions, or conduct violated the rights of plaintiff. Upon information and belief, DOES 1 through 5 are sued in the official capacity (for injunctive and declaratory relief) and in the individual capacity (for damages) based on actions, inactions, or conduct taken or performed under the color of state law.

FIRST AMENDED COMPLAINT FOR DAMAGES PENALTIES INJUNCTIVE RELIEF.

26. Upon information and belief, DOES 11 through 20 are Investigative Unit

staff, agents, employees whose actions, inactions, or conduct violated the rights of plaintiffs. DOES 11 through 20 are sued in the official capacity (for injunctive and declaratory relief) and in the individual capacity (for damages) based on actions, inaction, or conduct taken or performed under the color of state law.

27. Upon information and belief, DOES 21 through 35 are correctional employees involved involved in the alleged assault on Johnny Pantoja and were acting under color of state law. The true names and identities of DOE Defendants 21 through 35 are presently unknown at this time. Plaintiff will seek leave to amend this complaint as soon as the true names and identities of these defendants are learned. DOES 21 through 35 are being sued in their individual and professional capacities.

28. Upon information and belief DOES 35 through 50 are correctional employees involved in retaliating, covering up, or otherwise harming plaintiff, including, but not limited to, denying and attempting to deny Decedent's access to medical care. DOES 26 through 50 were acting under color of state law. The true names and identities of DOE Defendants 26 through 50 are presently unknown to plaintiff. Plaintiff will seek to amend this complaint as soon as the true names and identities of these defendants are learned. DOE Defendants 26 through 50 are being sued in their individual and personal capacities.

29. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege true names and capacities when ascertained. Plaintiffs are informed and believes and thereupon alleges that each fictitious and named is responsible in some manner for the occurrences here alleged, and that Plaintiffs' injuries as herein alleged were proximally caused by the acts, omissions, of Defendants. For convenience, each reference to any of the named Defendants herein shall also refer to DOES 1 through 50, inclusive.

30. Plaintiffs are informed and believes, and thereon alleges that each defendant

is, and at all times mentioned was, the agent, employee, representative successor and/or assignee of each other defendant. Each defendant, in doing the acts, or in omitting to act as alleged in this

complaint, was acting within the scope of his or her actual and apparent authority or the alleged acts and omissions of each defendant as agent were subsequently adopted and ratified by each other defendant as principal. Plaintiffs are informed and believes that each of the individual defendant was in some way responsible for the constitutional violations and torts alleged in this complaint.

31. In committing the acts alleged herein, defendants acted knowingly, maliciously, and with reckless or callous disregard for the constitutional rights of plaintiffs, justifying an award of punitive damages against each defendant.

## CALIFORNIA CLAIM FILING REQUIREMENT

32. With regard to Plaintiffs' state-law causes of action, Plaintiffs complied with California's government tort claims requirements as set forth in California Government Code §§ 900 *et seq.*, with no response. Plaintiffs pursue their rights.

## GENERAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

33. Plaintiffs repeat and incorporate each and every allegation in paragraphs 1 through 32 of this Complaint with the same force as if fully set forth herein.

34. Plaintiffs file this suit to seek to understand the truth of what happened to their family's beloved son, brother, uncle and family member Johnny Pantoja and seek all applicable rights, justice and accountability, on Johnny's behalf as successors in interest.

35. Plaintiffs allege Decedent complained of vicious and unwarranted assaults, as well as actions, omissions, or gross negligence, leading to the untimely death of decedent under the color of state law.

36. Decedent Johnny Pantoja was incarcerated as a juvenile at sixteen (16) years old, initially for six (6) months, and detained throughout his young life. In spite of his potential release, he was dead in custody by age thirty-one (31).

37. In 2022, the California Department of Corrections and Rehabilitation's 33 correctional facilities have resulted in an alleged three hundred eighty-nine (389) in custody deaths, including an alleged twenty-one deaths by suicide.

38. Long before Johnny Pantoja's deaths, each of the individually named defendants from the

California Department of Corrections and Rehabilitation and the California Correctional Health Services knew that there existed a great indifference to the safety and protection of the inmates who were in the government's custody within CDCR's correctional facilities, including Folsom.

39. California Department of Corrections and Rehabilitation has a long, sordid history of committing alleged human rights abuses that are prohibited by law. This is particularly problematic and concerning as CDCR is the second largest corrections facility in the United States. At present, CDCR provides health care services to approximately 129,000 prisoners in 35 prisons and 43 conservation camps throughout the State of California.

40. Plaintiffs are informed and believes California has an incarceration rate of approximately 549 per 100,000 people, meaning it locks up a higher percentage of its people than almost any democratic country on the earth. CDCR – the state's largest agency, with a proposed 2023-2024 budget of $14.5 billion spends an immense amount of taxpayer-funded resources to operate an unlawful system.

41. CDCR asserts that its mission is, "To facilitate the successful reintegration of the individuals in our care back to their communities equipped with the tools to be drug-free, healthy, and employable members of society by providing education, treatment, rehabilitative, and restorative justice programs, all in a safe and humane environment." By disregarding mental health standards and guidance, CDCR undermines its stated rehabilitative mission – and does so unlawfully.

42. At least two class-action lawsuits, *Plata v. Schwarzenegger and Coleman v. Brown*, were brought against CDCR challenging the constitutionality of CDCR's inadequate medical and mental health care.

43. In *Plata v. Schwarzenegger,* the Court found CDCR's prison medical conditions were in violation of the Eighth Amendment of the United States Constitution's prohibition against cruel and unusual punishment. Case Nos. C01-1351 THE, 2005 U.S. Dist. LEXIS 43796, 2005 WL 2932243 (N.D. Cal, 2005). After repeated violations of a stipulated agreement and an order for injunctive relief, CDCR was held in civil contempt and its health care system was also placed in a receivership administered by the federal government (the "Federal Receiver" or "Receiver") in

2006.

44. Concurrent with *Plata*, in *Coleman v. Brown*, CDCR's mental health service arm was also found to have violated the Eighth Amendment of the U.S. Constitution's prohibition against cruel and unusual punishment. Case No. 2:90-cv-0520 LKK DAD (PC), 912 F. Supp. 1282 (E.D. Cal, September 13, 1995). The *Coleman* court appointed a special master who to-date monitors and reports on CDCR's compliance with applicable guidance. While *Coleman* was in active litigation, the special master submitted 16 interim reports, with later reports showing a troubling reversal in the progress of the remedial efforts of the preceding decade.

45. California courts have overseen lawsuits and class actions that have exposed CDCR's encouragement of race wars, gladiator fights, suppression of free speech, brutal conditions against its inmates, or disregard of mental health care in which CDCR has not fully complied, including on or about May 1, 2023, a Federal Judge ruled the State of California will be fined for each death.[1] CDCR has been alleged to misuse common policies surrounding security threat validations, solitary confinement and prison yard policies to destroy prisoner peace and other advancement efforts; there have been statewide hunger strikes to nonviolently protest indefinite solitary confinement in the Solitary Housing Unit (SHU). The first strike drew 6600 participants statewide, the second, 12000, and a third, 30000 participants – the largest prison hunger strike in history.

46. As a result of the Special Master reporting process and federal court orders, CDCR officials knew that CDCR policies and procedures in relation to mental health treatment and suicide prevention were inadequate. Each of the individually named defendants in this lawsuit also failed

---

[1] *See Ralph Coleman* et al., v. *Gavin Newson*, (E.D. Mar. 1, 2023, No. 29:90-cv-0520 KJM DB P); *See also Castillo v. Alameida,* (N.D.Cal. Nov. 15, 2004, No. 3:94-cv-02847-MJJ); *Mitchell v. Cate* (E.D.Cal. Sep. 8, 2015, No. 2:11-cv-1240 JAM AC P); *Ashker v. Brown* (N.D.Cal. Mar. 13, 2012, No. C 09-5796 CW); *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995); *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. & N.D, Cal. 2009); *Brown v. Plata*, 563 U.S. 493 (2011); *Coleman Brown,* 938 F. Supp. 2d 955 (E.D. Cal. 2013); *Coleman v. Brown*, 28 F. Supp. 3d 1068 (E.D. Cal. 2014).

2. The doctrine of *idem sonans* presumes the officer's identity despite any misspelling.

to provide sufficient oversight and leadership to ensure that staff at its CDCR facilities including Folsom, were adequately trained in suicide prevention or to ensure that CDCR mental health treatment and suicide prevention polices were actually implemented.

47. To date, Plaintiffs are informed and believes CDCR continues to foster an atmosphere that is hostile and has degraded, dehumanized and even deadly toward its inmates namely decedent Johnny Pantoja.

48. Plaintiffs are informed and believes witnesses have complained of the encounters and believe they are still experiencing retaliation and unsafe conditions.

49. Throughout the years, with on-going and very real concerns, Plaintiff's family heard and made complaints about their son's inhumane treatment and prolonged isolation as a form of 'rehabilitation'. Such concerns were left unaddressed.

50. Plaintiffs are informed and believes withheld documents and witnesses relating to alleged facts supporting negligence, medical neglect, falsified reporting, assault prior to Johnny's death.

51. Plaintiff was incarcerated for long periods of time including for extended periods in solitary confinement or indefinite isolation in the last five (5) years in the California State Prison Sacramento. He was, against his own volition, forced to spend most of his time in the Solitary Housing Unit (SHU).

52. When Johnny was placed in prison facing prolonged solitary confinement and/or administrative segregation he developed a CDCR history of mental health issues, including diagnoses of schizophrenia, suicide attempts, complaints of prescribed medications that altered his jovial personality, placed in segregated housing, solitary confinement, suicide watch, denial of visitation rights, complaints of negative interactions with multiple CDCR officials that exacerbated other mental, psychological, and physical distress.

53. Plaintiffs are informed and believes due to the prolonged confinement and inhumane treatment, Johnny experienced disabilities known to the officers.

54. The Mental Health Service Delivery System at the Enhance Outpatient Program took away his visitation rights, destroyed his personal items, medicated him with drugs

involuntarily, which would make him feel worse and physically ill.

55. Throughout his tenure and increasingly, in or about 2022, Johnny complained to his family about Defendant officers' threatening and abusive behavior toward him.

56. He complained of being forced to take medications that were harmful to him.

57. On or about January 27, 2022, he reported to an official that he was "suicidal" after which officials busted into and ransacked his cell in which they threw out his books, letters and pictures.

58. Throughout 2022, Plaintiffs are informed and believe that officials knew of Johnny's declining mental health and suicidal ideations.

59. It is believed, and informed that Johnny had personal belongings like a new television in Johnny and witnesses complained officers would break or destroy.

60. Throughout this time period the medical providers were aware of Decedent's mental health issues, the officers' retaliatory behavior, and suicide ideation.

61. Plaintiffs are informed and believe Decedent was victim to threatening and abusive behavior by the correctional officers responsible for Johnny's care.

62. On or about May 2022 Johnny's family spoke with him and he was very much looking forward to their upcoming family visit and upcoming release.

63. On or about June 1, 2022, Johnny completed a course called "Responsible Thinking" and was looking forward to his release.

64. On or about June 8, 2022, Johnny called his father Amado Pantoja looking forward to the family visit but expressing concern about DOE officers' improper and abusive behaviors toward him.

65. On or about June 16, 2024, Johnny Pantoja was transferred to the CDCR medical clinic with complaints of blunt-force type injuries, breathing, asthma-like symptoms, cough-respiratory distress, COVID, neuropathic pain/body pain, swelling to his knee and leg, and/or partial seizures. It was believed he plead for help stating he was feeling suicidal and will hang himself if he did not receive help.

66. Plaintiffs are informed and believes Johnny was placed in a tiny "holding

cage" and shackled with restraints in a small sally port area.

67. He was returned to his cell with a fixture and sheets to be able to injure himself despite his declining mental and physical health.

68. Defendants had a duty to provide him care.

69. Soon thereafter, Plaintiffs are informed and believes multiple witnesses saw or heard Johnny was pleading for medical help with no response or security/wellness checks from the DOE Defendants; witnesses expressed dismay that the officers still have job and are broken hearted over losing their beloved friend.

70. Eventually, witnesses heard or saw DOE Defendants pull Johnny out of his cell. Instead of performing Cardiopulmonary Resuscitation (CPR), DOE Defendants instead started to beat him violently and brutally to death. Witnesses believed this was to intimidate the other inmates and 'make an example' of Johnny which was wantonly and willfully inflicted with reckless disregard to the decedent's well-being.

71. Witnesses believed "they [CDCR Defendants] killed your brother".

72. Johnny was declared dead at or about 6:45 a.m. on June 17, 2024.

73. That morning Plaintiff Johnny's family heard at least three conflicting, confusing, and bizarre stories alleging blunt force trauma with pressure to the chest and neck on the floor and a wire around neck within the hour, then a suicide by hanging; thereafter, there was suggestion of a medical overdose and beating with a cover-up.

74. Officials such as one named Eric with the unknown but possible last name 'Altvatter' observed Johnny had looked great and healthy the day prior to his death.

75. Plaintiffs believe DOE Defendants – namely Eric Altvater insisted there will be no video evidence, and no autopsy would be necessary; they further suggested they could not provide any names of correctional officers, the nurse, and there were no possible witnesses on or about the day of the incident.

76. Plaintiffs are informed and believes the facility refused to provide all of Johnny's possessions including documents such as journals, daily logs, correspondence, letters to the family; instead, blank journals were returned in pieces or ripped to shreds; legal documents,

reports and complaints were kept by the DOE Defendants.

77. Plaintiffs are informed and believes plaintiff filed a preservation of documents and at least one other inmate filed a 602-grievance complaint shortly after the incident that should have preserved the videos of the incident, relating to the facts and circumstances surrounding Johnny's death.

78. Plaintiffs are informed and believes Johnny's loved ones asked CDCR if Decedent was murdered, to no response other than his belongings would be destroyed or not kept.

79. A CDCR medical provider believed to be named Dr. Cornish contacted the family seeking additional information and stating the medical records and psychological records did not make sense.

80. Plaintiffs are informed and believes at least one doctor noted signs of foul play or medical overdose with toxicology believed to include but not limited to: buprenorphine, norbuprenorphine, naloxone, opiates, morphine, naloxone, oxcarbazepine metabolite, codeine, mirtazapine, hydroxybupoprion, hydrocodone, gabapentin, pregabalin, oxcarbazepeine, oxcarbazepime, and conflicting forced prescriptions. Plaintiffs are informed and believes multiple body parts were completely removed including a cranial removal, the neck cut up with muscles removed, the tongue removed, a bloated, pregnant stomach, body parts removed to cover up blunt trauma, omohyoid muscles, blood, vertebrae up and down the spine, and opiate receptors.

81. Upon information and belief, in response to a request for records a CDCR official named Bill Davies responded that Plaintiff does not appear in the prison system's medical records for years.

82. Plaintiffs are informed and believes Johnny's body was returned with his fingers crushed, and visible bruising to his neck, face, and limbs.

83. Plaintiffs are informed and believes that Decedent and other inmates, known and unknown, had complained about guards' abuse or mistreatment of himself and other prisoners.

84. Plaintiffs are informed and believes Defendants would ransack and destroy the property of Johnny, with the intent of entering his cell was to start a fight with the Decedent.

85. Though the specific facts are unknown as the family has requested Johnny's

records including medical; psychological; incident reports; assault; complaints about the officers and were refused.

86. Plaintiffs are informed and believes there have been numerous alleged in custody beatings, death or homicides under suspicious circumstances relating to or in or about Johnny's unit including as representative examples, but not limited to: Sergeant Kevin Steele after alleging corruption (2021), a CSP Sacramento Guard Valentino Rodriguez, 3 guards were charged and convicted of Ronnie Price's homicide, Deandra Lewis (1/2022), Nathan Marcus (3/2022), Camilo Banos Lopez (5/2022), Wayne Coskey (7/2022), Felipe Rodriguez (10/2022), Joseph Horne (1/2023), Edward C. Bergman (5/2023), Mario Rushing (5/2023), Estate of Michael Olivo (1/2023)('24CV0896W), or earlier cases Richard Carrasco (7/2016), Rodrick Roman Castro (10/2017). These factual allegations, including the dates and names, are approximated as the family has been denied information relating to Decedent Johnny and any other similarly situated scenarios.

87. By way of example, Sergeant Kevin Steele wrote memos to top prison officials in which he alleged that rogue guards in the investigations unit had faked documents and planted drugs and weapons on inmates to obtain more overtime, spread false rumors and relayed private information from inmates' files to other inmates in violation of department policy, "and on at least two occasions have been directly involved in the killing of a CSP-Sacramento inmate" with "indifference" to reports of wrongdoing and to the "victimization" of in custody persons.

88. The facility has received complaints of inmates being beaten with fists and batons, sprayed with pepper spray, and shot with rubber bullets.

89. Plaintiffs are informed and believes witnesses made and filed Contemporaneous complaints that Johnny had been crying out and screaming for help.

90. Defendants have a duty to do wellness checks and did not or refused to do so.

91. Johnny's friends and neighbors were able to hear and/or see the incident(s).

92. Plaintiffs cannot presently state in detail the full details of what transpired because DOE defendants would not allow Johnny's family to inspect the actions that were being taken against Johnny nor have the full investigative reports, video surveillance or camera footage,

or other records been provided. Notably, as the recordholders have refused to release or provide full reports or records, Plaintiffs' allegations are incomplete and upon information and belief.

93. Upon information and belief, Defendants escalated use of force without a warning, or reason, and those of higher rank, failed to intervene to prevent the other officers from using excessive force. Defendants, and each of them, were an integral participant in the use of excessive force.

94. The following wrongful conduct, among other things, all of which were conducted deliberately and with deliberate indifference to Johnny's health, safety and welfare, proximately caused this avoidable tragedy:

   a. The CDCR officers acted pursuant to a policy, practice, and/or custom of not providing reasonable accommodations for the physically-mentally disabled and infringing the rights of in custody persons through the use of force without legal justifications;

   b. The responding officers failed to adequately train their personnel to appropriately and safely respond to and deal with situations involving individuals suffering from psychosis, mental illness, and/or mental disabilities (whether permanent or temporary).

   c. Plaintiffs are informed and believe that CDCR, and their managerial policymakers failed to equip responding deputies with reasonable techniques, tactics, and/or equipment.

   d. CDCR's final policymakers ratified the acts of CDCR employees, including the responding correctional officers or medical providers.

   e. Plaintiffs are informed and believe that, when learning of the events giving rise to the claim, the CDCR's final policymakers ratified the acts of CDCR employees, including the responding officers or medical providers.

   f. The CDCR defendants discriminated against, and failed to accommodate Johnny's disabilities, because of their perceptions of Johnny's disability and/or mental health.

   g. Plaintiffs are informed and believe that, when learning of the events giving rise to the claim, the CDCR final policymakers ratified the acts of CDCR employees, including the responding officers or medical providers.

   h. The responding officers and/or medical responders failed to use appropriate methods, and

failed to provide necessary and adequate medical care, and thus were a proximate cause of Johnny's death, with the cause of death as an unknown toxicology demonstrating gross negligence or indifference.

i. Up through the time that Johnny was transferred to a care facility, the responding deputies and medical providers compromised Johnny's breathing (through the use of electrical weapons, physical restraint and/or chemical sedation) to the point of inducing death by cardiac arrest, asphyxiation or a related cause.

j. The medical providers and/or correctional officers were grossly negligent or indifferent to Johnny's health.

95. The conduct alleged above by Defendants was both a cause-in-fact and proximate cause of the Decedent to be deprived of his civil rights protected under the United States Constitution and his death, entitling Plaintiffs, and each of them, for the loss of his love, society, companionship and support, and economic damages, including medical, funeral, and burial expenses.

96. Plaintiff Amado Pantoja is successor in interest pursuant to Cal. Civ. Proc. Code § 377.11 and succeeds as the natural father of DECEDENT. Plaintiffs are informed and believes prior to his detention and upon his imminent release Johnny made household and financial contributions relating to necessaries of life.

97. Plaintiff Maria de Lourdes Vera is successor in interest pursuant to Cal. Civ. Proc. Code §377.11 and succeeds to his interest as the natural father of DECEDENT. Plaintiffs are informed and believes prior to his detention and planned upon his imminent release Johnny contributed to household, financial contributions relating to necessaries of life.

## FIRST CLAIM FOR RELIEF

### Excessive Use of Force 42 U.S.C. § 1983

(By ESTATE OF JOHN PANTOJA against Defendants Officers and DOES 1-50)

98. Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 97 of this Complaint with same force and effect as if fully set forth herein.

99. Plaintiffs brings this cause of action as decedent's successor-in-interest

pursuant to Cal. Civ. Proc. Code §377.30 and §377.34 against all named and unknown defendants in their individual capacities.

100.    A survival action compensates the estate for losses suffered by the decedent prior to death. When there is a constitutional violation, under Survival Action provides "a cause of action for or against a person is not lost by reason of the person's death" California Code of Civil Procedure section 377.20.

101.    Cal. Civ. Proc. Code §377.34 provides "in an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable may include damages for pain, suffering, or disfigurement if the action or proceeding was granted a preference pursuant to Section 36 before January 1, 2022, or was filed on or after January 1, 2022."

102.    Plaintiff had a Fourth Amendment as incorporated to state actors under Fourteenth Amendment right to be free from being subjected to the excessive use of force by officers as unreasonable seizures.

103.    Defendants violated Decedent's Eighth Amendment to be free from excessive force when, on or about June 17, 2024, they unnecessarily escalated an encounter and used unreasonable and excessive force on Johnny and deprived him of equal protection under the law to be free from the imposition of punishment without due process of law; to be free from the imposition of cruel and unusual punishment, namely battering, abusing, and disregarding Decedent's subsequent pleas for help.

104.    Defendants, and each of the, acted maliciously and sadistically for the purpose of causing harm, and not in a good faith effort to maintain or restore discipline.

105.    Defendants, and each of them, were acting under color of law and an integral participant in the use of excessive force when battering Johnny in violation of Plaintiff's Eighth Amendment Right to be free from excessive force.

106.    As a proximate result of the foregoing, Johnny sustained great pain and suffering and suffered pre-death physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and loss of earning capacity, pre-death pain and suffering as

well as for loss of life.

107.   As a direct and foreseeable result of these officers' unreasonable and

excessive use of force, Johnny died.  Johnny therefore suffered special and general damages, including those arising from Johnny's pre-death pain and suffering, along with further damages according to proof at time of trial. The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Johnny, and therefore warrants the imposition of punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### Deliberate Indifference to Prisoner's Conditions of Confinement

### /Deprivation of Medical

### (U.S. Const. Amend. VIII; 42 U.S.C.§1983)

(By Plaintiff Estate of John Pantoja against all Defendants)

108.   Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 107 of this Complaint with same force and effect as if fully set forth herein.

109.   Decedent had a right to be free from "cruel and unusual punishments." This included the right to have reasonable medical treatment especially in a life threatening scenario. Defendants violated Decedent's Eighth Amendment right by withholding that treatment and care when medical needs were objectively serious, and that defendants were deliberately indifferent to Decedent's medical needs.

110.   Decedent faced a reasonable risk of serious harm.

111.   The defendant was deliberately indifferent to that risk or medical need, that is the defendant knew of it and disregarded it by failing to take reasonable measures to address it.

112.   The failure of defendants caused harm to the plaintiff.

113.   As a proximate result of the foregoing, Johnny sustained great pain and suffering and suffered pre-death physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, and loss of earning capacity, pre-death pain and suffering as well as for loss of life.

114.   As a direct and foreseeable result of these officers' unreasonable and

excessive use of force, Johnny died. Johnny therefore suffered special and general damages, including those arising from Johnny's pre-death pain and suffering, along with further damages according to proof at time of trial. The conduct of Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Johnny, and therefore warrants the imposition of punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

**Battery**

**(By ESTATE OF JOHN PANTOJA against Defendants CDCR, Officer Cavanaugh, Officer Nguyen, and DOE Officers, inclusive)**

115. Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 114 of this Complaint with the same force and effect as if fully set forth herein.

116. Plaintiffs assert his cause of action individually pursuant to California statutes Cal. Government Code §820 and California Common law on behalf of Decedent for those damages that survive.

117. As alleged above, on or about June 17, 2022, Defendants and currently unknown DOE defendants, while working as staff or officers for CDCR, acted with an intent to cause harmful or offensive contact with the person of Plaintiff and the intended harmful or offensive contact did in fact occur, including harming Decedent and crushing him.

118. The harmful or offensive contact was not privileged or consented to and was excessive unreasonable and done with deliberate indifference to the rights and safety of Decedent.

119. As the harmful contact was not privileged nor consented to and a reasonable person in Decedent's situation would be offended by the unjustified touching, it was tortious.

120. As a result of these actions, Decedent suffered severe pain and suffering and ultimately died from those injuries.

121. As a direct and foreseeable result of Defendants' intent to cause harmful contact to Decedent, the intended harmful or offensive contact did in fact occur, Plaintiffs have suffered special damages according to proof at trial.

122. The conduct was malicious, wanton, oppressive, and accomplished, with a

conscious disregard for the rights of Plaintiffs and Decedent, entitling Plaintiff

individually and as successor in interest to Decedent an award of exemplary punitive damages to

punish Defendant Officers, namely DOE Officers 1 through 5.

123. Because Defendants acted in the scope of their employment, CDCR are

vicariously liable for the harm proximately caused by their conduct pursuant to California

Government Code §815.2.

## FOURTH CLAIM FOR RELIEF

### Bane Act - Cal. Civ. Code § 52.1

(By Plaintiffs against all Defendants)

124. Plaintiffs reallege all prior paragraphs 1 through 123 of this Complaint and

incorporate the same herein by this reference as if fully set below.

125. Currently Officer Cavanaugh, Officer, Nguyen, and/or unknown DOE

Defendants interfered or attempted to interfere, with Johnny's rights under the U.S. and California

Constitutions to be free from unreasonable and excessive uses of force or gross negligence or

reckless indifference to his rights.

126. Currently Officer Cavanaugh, Officer Nguyen, unknown DOE Defendants

interfered or attempted to interfere, with Johnny's rights under the U.S. and California

Constitutions to be free from unreasonable and excessive uses of force or gross negligence or

reckless indifference to his rights.

127. Plaintiff had a firmly established right to be free from excessive force, to be

free from needless intimidation and escalation of situations, under the Fourth Amendment and the

Fourteenth Amendment to the United States Constitution and Article I, section 13 or equivalent

provisions of the California Constitution, guarantee (a) an individual's right to be free from

excessive force and (b) parents' rights to the companionship of their child.

128. California Civil Code, section 52.1 (the Bane Act) prohibits any person

from using violent acts or threatening to commit violent acts in retaliation against another person

for exercising that person's constitutional rights.

129. The California Legislature has declared that it violates California's civil

rights act for any person to interfere with the exercise or enjoyment by any individual of his rights secured by the United States Constitution or state or federal law. This includes any interference of these rights by threats, intimidation, coercion or attempted threats, intimidation, or coercion.

130. The California Legislature has declared that it violates California's civil rights act for any person to interfere with the exercise or enjoyment by any individual of his rights secured by the United States Constitution or state or federal law. This includes any interference of these rights by threats, intimidation, coercion or attempted threats, intimidation, or coercion.

131. Upon information and belief, the Defendants interfered with Plaintiffs' rights under the Fourth Amendment of the United States Constitution and the equivalent provisions of the state Constitution by the use of force alleged herein, including but not limited to the following:

(a) Injuring Decedent while restrained;

(b) Using improper restraint procedures;

(c) Ignoring Decedent's medical needs;

(d) Causing or Instigating an attack against Decedent;

(e) Attempting to cover up the injuries or harm to Decedent by manipulating statements and reports; intimidating witnesses; manipulating, withholding, or destroying video;

132. As a direct and proximate result of Defendants' actions, as alleged herein, Plaintiff was injured as set forth above and is entitled to fees and damages, including compensatory and punitive damages, in an amount to be proven at trial and in excess of the jurisdictional amount required by this Court.

133. This interference with Plaintiff's rights was perpetrated by the Defendants in violation of California Civil Code § 52.1 and their right under the Fourth and Fourteenth Amendments to be free from excessive force under the Fourth Amendment and the Fourteenth Amendment to the United States Constitution and the California Constitution.

134. Due to the violation of Plaintiffs' rights by all Defendants, Plaintiffs

suffered economic damages and non-economic damages, including, but not limited to, emotional distress, pain and suffering, medical expenses and fear caused by the acts complained of herein according to proof at the time of trial.

## FIFTH CLAIM FOR RELIEF

**Americans with Disabilities Act**

**(42 U.S.C. § 12101, *et seq.*)**

(By Plaintiffs against all Defendants)

135.  Plaintiffs realleges all prior paragraphs 1 through 134 of this Complaint and incorporate the same herein by this reference.

136.  Plaintiffs assert this cause of action as Johnny's successor in interest.

137.   On or about June 17, 2022, Johnny was an individual who had a disability as defined in 42 U.S.C. § 12102.

138.  Title II of the ADA provides that individuals with disabilities cannot be "excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42. U.S.C. 12132.  This provision applies to services, programs, or activities".  <u>Sheehan</u> v. <u>City & Cnty of San Francisco</u>, 743 3d 12 11, 1231 (9 th Cir. 2014), *rev'd* in part on other grounds by <u>City</u> & <u>Cnty of San Francisco</u>, 575 U.S. 600 (2015).  At minimum the CDCR  officers that responded to the 911 call perceived Johnny as having a disability.

139.  Due to the violation of Plaintiffs' rights by all Defendants, Plaintiffs suffered economic damages and non-economic damages, including, but not limited to, emotional distress, pain and suffering, medical expenses and fear caused by the acts complained of herein according to proof at the time of trial.

140.  DEFENDANTS knew or should have known Johnny to have a disability.  When DEFENDANTS arrived, no was in danger; DEFENDANTS needed only to listen to Johnny, interact with him respectfully (by, for example, responding or recognizing that he was unwell), then drive him to the hospital for mental or physical medical treatment.  Instead, the officers; behaving aggressively toward Johnny, ignored him, refused to respond to him calmly,

or insisted on rushing and assaulting him.

141.   The responding deputies acted aggressively toward Johnny because of his actual or perceived disability.  That is, these officers discriminated against John because of his actual or perceived disability. This unnecessary escalation of an already delicate situation ultimately led to the officers' use of repeated levels of restraint and force, which includes force that ultimately caused Johnny's death.

142.  Facially neutral policies may violate the ADA when such policies unduly burden disabled persons.

143.   Title II of the ADA provides that the responding deputies had a duty to make reasonable accommodations in dealing with Johnny, including, for example, being civil and respectful upon first contact.  *See* 42 U.S.C. 12182(b)(2)(A).  These deputies failed to comply with this duty.

144.   Further, the Rehabilitation Act of 1973 ("Section 504") states in pertinent part, provides that "No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 U.S.C. § 794(a)

145.   Defendants failed to accommodate Johnny Pantoja with services and programs available to patients with mental health disabilities.

146.   Plaintiffs are informed and believe and thereon allege that, unless enjoined, Defendants will continue to engage in the unlawful acts and in the policies and practices described above, in violation of the legal and constitutional rights of the plaintiffs and others who are similarly situated.

147.   Plaintiffs face real and immediate threat of repeated and irreparable injury and continuing, present adverse effects due to Defendants' unlawful misconduct, policies and practices. Plaintiffs have no adequate and complete remedy at law.

148.   As a direct and foreseeable result of these deputies' actions, Johnny died.

Johnny therefore suffered special damages, along with further damages according to proof at the time of trial.

149.    These entities and persons are responsible for the lack of proper supervision, training, or discipline; pursuant to policy or custom; and/or the result of the lack of policy and custom, where those entities and officials responsible for condoning constitutionally-deficient conduct, and for establishing policies or customs of action or inaction that caused or contributed to Claimants' injuries and Decedent's death.  In addition the State of California and California Department of Corrections and Rehabilitation are vicariously responsible, through the principles of *respondeat superior*, for the actions and inactions of their officers, employees and/or agents. *See* Cal. Gov. Code §§ 815.2(a), 820(a).   The multiple currently-unknown officials, personnel, employees and/or agents are responsible for actions and inactions causing claimants injuries and Decedent's death. CDCR, officials, personnel, employees and/or agents were well informed of Decedent's mental health issues; history; risk for self-harm and suicide.

150.   Because the officers acted in the scope of their employment, CDCR and Defendants are vicariously liable for the harm proximately caused by the deputies' conduct pursuant to California Government Code §815.2.

## SIXTH CLAIM FOR RELIEF

### Deliberate or reckless suppression or interference of evidence

(By Plaintiffs against all Defendants)

151.   Plaintiffs incorporate the allegations of paragraphs 1 to 150 herein.

152.   Upon information and belief there is evidence that a party improperly altered evidence, concealed or destroyed it, including that Defendants stated to family that critical evidence like medical records did not exist or would not be retained.

153.   Plaintiffs are informed and believes the facility refused to provide all of Johnny's possessions including documents such as journals, correspondence, letters; blank journals were returned in pieces or ripped to shreds; witness observations, daily logs, legal documents, reports and complaints were kept by DOE Defendants.

154.   It is unlawful for a government party or agent to alter, conceal or destroy

FIRST AMENDED COMPLAINT FOR DAMAGES PENALTIES INJUNCTIVE RELIEF.

evidence.

155.  Damages, penalties, or injunctive relief are to be proved at trial.

156.  Because the officers acted in the scope of their employment,

CDCR and Defendants are vicariously liable for the harm proximately caused by the deputies' conduct pursuant to California Government Code § 815.2.

### SEVENTH CLAIM FOR RELIEF

**Unwarranted Interference with Familial Relations**

**(Cal. Const. Art. I §7 (a))**

(By Plaintiffs, individually, against all Defendants)

157.  Plaintiffs incorporate the allegations of paragraphs 1 to 156 herein.

158.   Plaintiff had a cognizable interest under the California Constitution Article I §7(a) to be free from state actions that deprive them of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in the parents' familial relationship with their son and the Decedent's familial relationship with his parents.

159.   As a result of Johnny's death, Plaintiffs were deprived of their relationship and right to familial companionship and society.

160.  Plaintiffs. was deprived of their relationship with their son.

161.   As set forth in the Causes of Action, Johnny died as a result of Defendants' tortious action. The actions of DEFENDANTS along with other undiscovered conduct, shocks the conscience. The individual defendants acted in reckless and deliberate indifference to the constitutional rights of Decedent and Plaintiffs.

162.  The conduct alleged above by DEFENDANTS were both a cause-in-fact and proximate cause of Plaintiffs to be deprived of their civil rights protected under the United States Constitution.  As a direct and foreseeable result of this denial of substantive due process, Plaintiffs have suffered damages according to proof at trial.   Plaintiffs have lost the benefit of financial support that Johnny would have provided to them during the remainder of his life, or the remainder of each of Plaintiffs' lives.

163.  Plaintiffs, and each of them, seek general and special damages, including emotional distress, for the loss of their son, and each of them, for the loss of his love, society, companionship, comfort, care, assistance, protection, affection, society, and moral support, as well as economic damages, including medical, funeral, and burial expenses.  Plaintiffs have lost the gifts, benefits, and the reasonable value of household services that Johnny would have provided.

164.  Plaintiffs reallege all prior paragraphs of this complaint and incorporate the same herein by this reference as if fully set below.

## EIGTH CLAIM FOR RELIEF

### Wrongful Death (CCP 377.60 *et seq.*)

(By ESTATE OF JOHN PANTOJA against all Defendants)

165.  Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 164 of this Complaint with same force and effect as if fully set forth herein.

166.  Defendants committed tortious acts against Plaintiff.

167.  Defendants had a duty to Johnny Pantoja to act with care and prudence so as not to cause harm or injury to another.

168.  Defendants breached that duty of care.

169.   Under Cal. Civ. Proc. Code § 377.60 *et seq*, which is incorporated by § 1988, each Plaintiffs are each an individual authorized to bring a cause of action grounded in Johnny's wrongful death.

170.  Defendants improperly, negligently, recklessly used excessive and unreasonable force against Johnny Pantoja.

171.  As set forth in the First through Seventh causes of Action herein, Johnny died as a result of Defendants' tortious conduct.

172.  All claims asserted herein against the Defendant CDCR are presented pursuant to the CDCR's vicarious liability for acts and omissions of municipal employees undertaken in the course and scope of their employment pursuant to California Government Code §§815.2(a) and 820(a).

173.  Defendants, while acting under color of law and in the course and scope of

his employment with the Defendants CDCR negligently, wantonly, or grossly indifferent failed to assist and even worse, intentionally inflicted multiple injuries on Johnny, killing him. John Pantoja died as a direct and proximate result of the wounds inflicted or gross indifference to his healthy and safety.

174. As a direct and foreseeable result of Defendants' actions or gross negligence, Johnny was killed. As a result of Johnny's death, Plaintiffs have suffered economic and non-economic damages. Plaintiffs have lost John's financial contributions for the necessaries of life. Plaintiffs have lost the benefit of financial support that John would have provided them during the remainder of his life, or the remainder of each of Plaintiffs' lives. Plaintiffs have lost any gifts or other benefits as anticipated from a beloved family member. Plaintiffs have incurred medical, funeral, and burial expenses. Plaintiffs have lost the love reasonable value of financial and household services that Johnny would have provided and other damages.

175. Plaintiffs Amado Pantoja and Maria de Lourdes Vera have lost Johnny's love, society, companionship, comfort, care, assistance, protection, affection, society, and moral support, Plaintiffs has lost Johnny's love and support.

## NINTH CLAIM FOR RELIEF

### Substantive Due Process (42 U.S.C. § 1983)

### Fourteenth Amendment – Interference with Familial Relations

(By Plaintiffs against all Defendants)

176. Plaintiffs incorporate the allegations of paragraphs 1 to 175 herein.

177. As set forth in the First through Eighth Causes of Action, Johnny died as a result of Defendants' deliberate indifference and conscious shocking conduct.

178. Plaintiffs are informed and believes that Johnny lived with them prior to incarceration and planned to return in the upcoming release to provide financial resources, household care, and contributed to the necessaries of life.

179. Plaintiffs had a cognizable interest under the Due Process Clause of the

Fourteenth Amendment of the United States Constitution to be free from state actions that deprive them of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Decedent's familial relationship with his parents.

180.    As a result of John's death, Plaintiffs were deprived of their Fourteenth Amendment right to familial companionship and society. *See, e.g.,* <u>Smith</u> v. <u>City of Fontana</u>, 818 F. 2d 1411, 1419-20 (9th Cir. 1987).

181.    Plaintiffs. was deprived of their relationship with their son.

182.    Plaintiff had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive her of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Plaintiff's familial relationship with their son.

183.    As set forth in the Causes of Action, John died as a result of Defendants' tortious action. The actions of DEFENDANTS along with other undiscovered conduct, shocks the conscience. The individual defendants acted in reckless and deliberate indifference to the constitutional rights of Decedent and Plaintiffs.

184.    The conduct alleged above by DEFENDANTS were both a cause-in-fact and proximate cause of Plaintiffs to be deprived of their civil rights protected under the United States Constitution. As a direct and foreseeable result of this denial of substantive due process, Plaintiffs have suffered economic and non-economic damages.   Plaintiffs have lost the benefit of financial support that John would have provided to them during the remainder of his life, or the remainder of each of Plaintiffs' lives.

185.    Plaintiffs, and each of them, seek general and special damages, including emotional distress, for the loss of their son, and each of them, for the loss of his love, society, companionship, comfort, care, assistance, protection, affection, society, and moral support, as well as economic damages, including medical, funeral, and burial expenses.  Plaintiffs have lost the gifts, benefits, and the reasonable value of household services that Johnny would have provided.

///

///

## TENTH CLAIM FOR RELIEF

### Negligence

(By ESTATE OF JOHN PANTOJA, by and through his successors in interests, against all Defendants)

186.   All preceding paragraphs 1 through 185 are incorporated as if fully set forth herein.

187.   Plaintiffs are informed and believes DOE Defendants owed a duty of care to the Plaintiffs, including the safety and well-being of inmates such as providing appropriate medical care, ensuring prison conditions meet healthy safety standards, protecting inmates from foreseeable harm such as violence or unsafe living conditions.

188.   Defendants owed a duty of reasonable care to Plaintiff.

189.   Defendants breached that duty of care.

190.   Defendants' conduct was a substantial factor in causing Plaintiff Johnny Pantoja's harm, injury, and emotional distress, including but not limited to suffering anguish, fright, horror, nervousness, grief, anxiety, shock, humiliation and shame.

191.   Because the officers acted in the scope of their employment, CDCR DEPARTMENT are vicariously liable for the harm proximately caused by the officers' conduct pursuant to California Government Code § 815.2.

## ELEVENTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

(By ESTATE OF JOHN PANTOJA, by and through his successors in interests,  against Officer Cavanaugh, Officer Nguyen, and DOE Officers)

192.   All preceding paragraphs 1 through 191 are incorporated as if fully set forth herein.

193.   Defendants committed tortious acts.

194.   Plaintiffs are informed and believes DOE Defendants used unreasonable, unnecessary, and disproportionate force when interacting with plaintiff and thereafter intentionally ignored his pleas for help. The conduct of Defendants was outrageous, in that these officers

unnecessarily escalated then ignored a delicate, unnecessary and under control situation to the point that deputies used a significant amount of violence against Johnny.

195. These officers acted with reckless disregard of the probability that their actions would cause Johnny harm or severe emotional distress. This type of behavior would be deemed extreme and outrageous conduct by any reasonable person.

196. Plaintiff suffered severe emotional distress, in that he witnessed and experienced the incident of the Officers' killing and restraining himself and their refusal for medical providers to attend to or comfort him.

197. On information and belief, the facts support any ordinary reasonable person would be unable to cope with the circumstances and the behavior that ensued.

198. The officers' conduct was a substantial factor in causing Plaintiff Johnny Pantoja's severe emotional distress, including but not limited to suffering anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame.

199. Because the officers acted in the scope of their employment, CDCR DEPARTMENT are vicariously liable for the harm proximately caused by the officers' conduct pursuant to California Government Code § 815.2.

## TWELFTH CLAIM FOR RELIEF

### Deprivation of Medical Care (42 U.S.C. 1983)

**(**By ESTATE OF JOHN PANTOJA against Officers Cavanaugh, Officer Nguyen, and DOES 1 through 50)

200. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 199 of this Complaint with the same force and effect as if fully set herein.

201. The denial of medical care by Defendants Officer Cavanaugh, Officer Nguyen, and DOES 1 through 50 deprived Johnny of his right to be secure in his person against unreasonable searches and seizures of his person as guaranteed under the Fourth or Eighth Amendment of the United States Constitution and applied to state actors by the Fourteenth Amendment.

202. Defendant prison officials, correctional officers, medical staff, or those

present knew that the failure to provide timely medical treatment to Decedent could result in further significant injury, unnecessary and wanton infliction of pain, or death, but instead disregarded that serious medical need, failing to provide needed medical care, and disregarding or causing an excessive risk to the safety or health of Johnny, preventing the appropriate treatment, compromising his ability to breathe freely, injuring him, failing to take reasonable steps to provide medical treatment, thereby causing further injury.

203.   Defendants, Officer Cavanaugh, Officer Nguyen, knew that Johnny suffered a significant risk to his health if untreated and the failure to provide medical treatment to Johnny could result in further significant injury, the unnecessary and wanton infliction of pain, or death, but disregarded the serious medical need, causing Johnny great bodily harm and death.

204.   The conduct of Defendants was wanton, willful, malicious and done with reckless disregard to the rights and safety of Johnny and therefore warrants the imposition of exemplary and punitive damages as to defendants.

205.   As a result of their misconduct, Defendants are liable for Decedent's injuries, either because they were integral participants in the injuries or denial of medical care, and/or because they failed to intervene to prevent these violations.

206.   As a direct and foreseeable result of defendants' deliberate indifference to Johnny's serious medical needs, Johnny suffered great physical pain, emotional distress, loss of enjoyment of life, loss of earning capacity, and died.

207.   Because the officers acted in the scope of their employment Defendants are vicariously liable for the harm proximately caused by the deputies' conduct pursuant to Government Code §815.2.

## **THIRTEENTH CLAIM FOR RELIEF**

### **Violation of the Rehabilitation Act**

### **29 U.S.C. §794(a)**

(By ESTATE OF JOHN PANTOJA against all Defendants)

208.   Plaintiffs reallege all prior paragraphs of this complaint 1 through 188 and incorporate the same herein by this reference.

FIRST AMENDED COMPLAINT FOR DAMAGES PENALTIES INJUNCTIVE RELIEF.

209. The Rehabilitation Act of 1973 ("Section 504") states in pertinent part,

provides that "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a).

210. Plaintiffs are informed and believe DEFENDANTS CDCR are programs

that receives federal financial assistance as defined in 29 U.S.C. § 794(b).

211. Johnny Pantoja was a "qualified individual with a disability" under the

Rehabilitation Act.

212. DEFENDANTS violated the Rehabilitation Act by failing to make

reasonable accommodations to the needs of Johnny Pantoja, a disabled person. It was a reasonable accommodation to transfer a mentally distressed patient to a mental health facility where he could receive necessary services.

213. Defendant employees of Defendant CDCR were deliberately indifferent to

John Pantoja's serious medical condition. They failed to consider obvious symptoms of Johnny's health conditions when defendants refused proper treatment.

214. Defendants improperly and wrongfully subjected John Pantoja to a barrage

of injuries instead of taking him to a medical health care facility.

215. DOE DEFENDANTS 1 through 50 improperly, negligently, wrongfully,

and recklessly failed to transport Johnny Pantoja to a psychiatric care facility and instead shot him to death, pushed him into the ground, and expedited his brutal death and pre-death pain & suffering.

## FOURTEENTH CLAIM FOR RELIEF

### Supervisory Liability Causing Constitutional Violations

### Failure to properly Train, Supervise, Discipline, Ratification (42 U.S.C. 1983)

#### (By ESTATE OF JOHN PANTOJA against Defendants)

216. Plaintiff realleges and incorporate herein by reference each of the preceding paragraphs of
this complaint, and any subsequent paragraphs.

217. Defendants had a duty to hire, supervise, train, and retain employees and/or agents so that employees and/or agents refrained from the conduct and/or omissions alleged herein.

218. Defendants breached this duty, causing the conduct alleged herein. Such breach constituted negligent hiring, supervision, training, and retention under the laws of the State of California.

219. As a direct and proximate result of Defendants' failures, Plaintiffs suffered injuries and damages alleged herein.

220. The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff and others, and were therefore malicious, wanton, and oppressive. As a result, Defendants' actions justify an award of exemplary and punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. That judgement be rendered in favor of Plaintiffs and against Defendants on all causes of action herein;

B. Compensatory general (including economic and noneconomic damages) and special damages in accordance with proof;

C. Exemplary damages against individual Defendants to be determined at trial;

D. Costs of suit necessarily incurred herein;

E. Reasonable attorney's fees, expenses, and costs of litigation pursuant to 42 U.S.C. §§ 1983-1988, California Civil Code §§52.1 et *seq*., and any other relevant statutory or case law; and

F. Any and all other further relief in law or equity to which the Plaintiff may be entitled to, to prevent future deaths, and which this Court deems just or proper.

DATED: January 15, 2025          LAW OFFICES OF EMILY E. HOWE

                                         *By s/* Emily Howe
                                         Emily Howe
                                         Attorneys for Plaintiffs
                                         emh@howelaws.com

FIRST AMENDED COMPLAINT FOR DAMAGES PENALTIES INJUNCTIVE RELIEF.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demands trial by jury pursuant to Fed. R. Civ. P. 38(b) of the Federal Rules of Civil Procedure and the Seventh Amendment to the U.S. Constitution.

DATED: January 15, 2025                    LAW OFFICES OF EMILY E. HOWE

*By s/* Emily Howe
Emily Howe
Attorneys for Plaintiffs
emh@howelaws.com

FIRST AMENDED COMPLAINT FOR DAMAGES PENALTIES INJUNCTIVE RELIEF.