1  Emily E. Howe, State Bar No. 293964
2  LAW OFFICES OF EMILY E. HOWE
   405 Via del Norte, Ste B
3  La Jolla CA 92037
   Telephone: (619) 800-6605
4  Email: emh@howelaws.com
   Attorney for Plaintiffs
5

6              **UNITED STATES DISTRICT COURT**
7         **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8  ESTATE OF JOHN PANTOJA, by and through )   Case No.: 2:24-cv-01709-JDP
   its successors-in-interest AMADO PANTOJA, )
9  individually and as successor in interest, )   **FOURTH AMENDED COMPLAINT**
   MARIA DE LOURDES VERA, individually )   **FOR DAMAGES AND DECLARATORY**
10 and as successor in interest, to JOHN )   **RELIEF**
   PANTOJA. )
11                                          )   **Jury Trial Demanded.**
                                           )
12             Plaintiff(s), )
                                           )   (1)  Excessive Force U.S. Const. Amend. VIII;
13      vs. )   (42 U.S.C. § 1983)
                                           )   (2) Deliberate Indifference-Failure to Protect
14 CALIFORNIA DEPARTMENT OF )   (U.S. Const. Amend. VIII; 42 U.S.C. §1983);
   CORRECTIONS & REHABILITATION; )   (3) Americans with Disabilities Act
15 JEFFREY LYNCH, individually & in his )   (42 U.S.C. § 12101, *et seq.*);
   official capacity as warden; )   (4) Conspiracy to Violate Civil Rights
16 KATHLEEN ALLISON; JEFFREY )   (42 U.S.C. 1983; 1985)
   MACOMBER; DIANA TOCHE; AMAR )   (5) Unwarranted Interference with Familial
17 MEHTA; Officer C. CAVANAUGH; CSP )   Association (42 U.S.C§1983)
   NGUYEN; CSP RICARDO RIOS; ONOMEN )   (6) Wrongful Death
18 ODIAHI, ERIK ALTVATTER; LORI )   (Cal. Code Civ. Proc. § 377.60).
   CHESTER; DOES 1 through 20, inclusive in )   (7) Negligence.
19 their official and personal/individual capacities, )   (8) Failure to Provide Medical Treatment /
                                           )   Deprivation of Medical Care (42 U.S.C §1983)
20             Defendant(s). )   (9) Violation of Rehabilitation Act
                                           )   (10) Supervisory Liability Causing
21                                          )   Constitutional Violations (Failure to Properly
                                           )   Train, Supervise and Discipline, Ratification
22                                          )   (*Monell*, 42 U.S.C. §1983)
23

24

25

26

27

28

Plaintiffs, ESTATE OF JOHN PANTOJA, by and through their attorneys, AMADO PANTOJA, individually and as successor in interest, and MARIA DE LOURDES VERA, individually and as successor in interest, allege against Defendants, and state as follows:

**INTRODUCTION**

1. JOHN PANTOJA ("Johnny" or "Decedent") is and was a beloved, son, brother, and family member who had hope and excitement for his future. The family was shocked and devastated to learn their loved one had passed away, which has been a profound and unimaginable loss.

2. Plaintiffs are informed and believe of the facts stated herein. Plaintiffs have amended this complaint to address formatting issues and seek an updated summons. Defendants hold and continue to hold the vast universe of documents. Plaintiffs will seek leave to clarify, if needed.

3. This civil rights wrongful death/survival action seeks to access the full extent of facts, transparency, and accountability surrounding the June 17, 2022 death without justification, of 31-year-old JOHN PANTOJA while he was under the care and custody of the CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ("CDCR") and located at or about California State Prison Sacramento, 100 Folsom Prison Road, Represa, CA 95671.



4. Johnny had been a 16-year-old indigenous, impoverished student who entered the juvenile detention to California prison system as a minor, and ended up dead at age thirty-one (31).

5. On or about Thursday, June 16, 2022, Johnny pled for help from employees of CDCR in which a medical report-clinical review opined: blunt-force trauma type injuries, trouble breathing, asthma-like symptoms, cough-respiratory distress, COVID symptoms, severe neuropathic pain/body pain, swelling to his leg, and/or possible partial seizures; witnesses heard him cry out for help and threaten self-harm due to the pain and inhumane conditions, but was

FOURTH AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

returned to his housing cell despite clear and known risks.  He was found dead the next morning.

6.   Initially, the Sacramento autopsy classified the death as possible: "suicide".

7.   Amado Pantoja, Johnny's father, had a recent phone call with Johnny who was very much looking forward to a family visit and spoke about plans for his civilian life. Given Johnny's plans for reentry his family was shocked and baffled by the differing and conflicting reports of his death.

8.   Plaintiffs are informed and believes that Johnny's pleas for help were largely ignored. The full extent of Johnny's injuries, the identities of CDCR staff, and circumstances surrounding his death are unknown at this time, as not all reports or discovery have been fully released.

9.   Plaintiffs seek their day in court to unveil the full truth and shed light on what happened to their family's beloved Johnny Pantoja, the blatant disregard for safety, and preserve all applicable rights, justice, and accountability, on his behalf, individually and as successors in interest.

## JURISDICTION AND VENUE

10. This is an action for monetary damages brought pursuant to Title 42 of the United States Code, sections 1983, 1985, and 1988; and the First, Fourth, Eighth and Fourteenth Amendments of the United States Constitution, the Americans with Disabilities Act ("ADA") 42 U.S.C.§12312 and 28 C.F.R.§35 et seq, the Rehabilitation Act ("RA") 29 U.S.C. §794 and 28 C.F.R. §35, et seq., and the laws and Constitution of the State of California, against various correctional employees then working at the California Department of Corrections and the agency, itself, in Sacramento.

11. This Court has original jurisdiction pursuant to 42 U.S.C. § 1983.  Federal jurisdiction exists under 28 U.S.C. §1331 (federal question) and 28 U.S.C. §1343(a)(3) and (4)(civil rights). This court also has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C.§ 1367 (a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution. Plaintiffs bring this action under state law, the United States, the Constitution, and applicable law.

12. Venue is proper in the United States District Court for the Eastern District of California ("Eastern District") pursuant to 28 U.S.C. §1391(b)(2) because the events, acts, and/or omissions giving rise to the claims occurred in the County of Sacramento in the Eastern District.

///

**PARTIES**

**A. Plaintiffs**

13.  Before his death, JOHN PANTOJA ("Johnny" or "Decedent"), an individual and citizen of the United States, resided in the County of Sacramento, at all times relevant to this Complaint.

14. The Estate is the Estate of Decedent JOHN PANTOJA. Pursuant to section 377.20 of California Code of Civil Procedure, the Estate has standing to bring claims for torts resulting in Decedent's death. Since Johnny's death occurred in Sacramento, the estate resides in this Court.

15.  DECEDENT Johnny Pantoja died intestate. Johnny had no children or spouse.

16.  Cal. Civ. Proc. Code § 377.31, provides in pertinent part, "the court shall allow a pending action or proceeding that does not abate to be continued by the Decedent's personal representative or, if none, by the Decedent's successor in interest.

17. Plaintiffs brings this action as Decedent's successor-in-interest pursuant to Cal. Civ. Proc. Code §377.30 and §377.34 against named and unknown defendants in their individual capacities.

18.  A survival action compensates the estate for losses suffered by the Decedent prior to death. When there is a constitutional violation, under Survival Action provides "a cause of action for or against a person is not lost by reason of the person's death" Cal. Civ. Proc. Code § 377.20.

19.  Cal. Civ. Proc. Code §377.34 provides "in an action or proceeding by a Decedent's personal representative or successor in interest on the Decedent's cause of action, the damages recoverable may include damages for pain, suffering, or disfigurement if the action or proceeding was granted a preference before January 1, 2022, or was filed on or after January 1, 2022."

20.  At all relevant times, Plaintiff Amado Pantoja, is and was an individual domiciled in the County of San Diego, California. Plaintiff Amado Pantoja is the natural father of decedent. Plaintiff Amado sues both in his individual capacity as the father of DECEDENT and as a successor-in interest to DECEDENT's rights in his ESTATE pursuant to Cal. Civ. Proc. Code §§377.10, 377.20; 377.30 et seq. for survival actions and §§377.60 et seq. for wrongful death and claims for violations of their personal federal constitutional rights to familial association, and filed the declaration by Cal. Civ. Proc. Code § 377.32. (*See* Pantoja Declaration with Exhibit A.)

21.  At all relevant times, Plaintiff Maria de Lourdes Vera is and was an individual domiciled

in the County of San Diego, California. Plaintiff Maria de Lourdes Vera is the natural mother of JOHN PANTOJA. Plaintiff Maria de Lourdes sues in her individual capacity and as a successor in interest pursuant to Cal. Civ. Proc. Code §377.10 et seq. (*See* de Lourdes Vera Declaration.)

22. All Plaintiffs bring their claims individually, and Plaintiffs Amado Pantoja and Maria de Lourdes Vera, as parents who are informed and believe, received support from Decedent Johnny Pantoja, brings claims for wrongful death, and survival claims, on the basis of 42 U.S.C. §§1983 and 1988, the United States Constitution, federal and state civil rights law, and California law.

**B. Defendants**

23.  At all relevant times, Defendant CALIFORNIA DEPARTMENT OF REHABILITATION AND CORRECTIONS ("CDCR") is a California state agency and public entity that receives state and federal funding including from the United States Department of Justice and other federal agencies. CDCR's principal place of business is in California, based in Sacramento, California, where Decedent died. CDCR is an agency for the State of California that operates and administers its policies, practices and procedures on inmates. CDCR is legally required to conduct its activities with the Americans with Disabilities Act, the Rehabilitation Act, the U.S. Constitution and applicable law. CDCR was responsible for assuring the actions omissions, policies, procedures, and practices of its employees, including the California Correctional Health Care Services ("CCHCS") employees, complied with the Constitutions of the United States and the State of California. CDCR's sued on the Americans with Disabilities and Rehabilitation Acts, the causes of action the governments have allowed for state suits as an exception to the Eleventh Amendment.

24. At all relevant times, JEFFREY LYNCH is or was the Warden of CDCR Folsom and legally responsible for the administration and oversight of operations at CDCR, implementation of CDCR policy and procedures, staff training, the supervision of all agents employed by Defendants, and the safety and security of in custody persons at Folsom. Defendant was directly contacted about Plaintiff's complaints and death on or about June 17, 2022.  Defendant is regularly provided and/or informed of the monitoring and findings of the *Coleman* Special Master and the orders of the *Coleman* Court relating to New Folsom, including suicide audits.  Defendant Lynch had been directly in charge of facilities and the inmates' welfare, and knew or should have known about the

FOURTH AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

actions, omissions, and gross indifference of the officers. Defendant Lynch has ultimate and direct authority over CDCR's policies, practices and procedures and is responsible for ensuring that they comply with all state, federal and relevant law governing employees and person(s) in custody. Specifically, he has the ultimate authority to discipline, terminate, investigate, and transfer correctional staff, as well as oversee, review and approve investigations in grievances and complaints. His affirmative conduct or omissions involves his knowing failure to ensure enforcement of policies, rules, or directives that set in motion a series of actions in which he knew or reasonably should have known would cause a constitutional injury on John Pantoja. He is sued in his official capacity (for injunctive and declaratory relief) and in his individual capacity (for damages) based on actions, inactions, or conduct taken under the color of law.

25. At all relevant times relevant to this Complaint, California State Prison ("CSP") Officer RICARDO RIOS is an individual believed to reside in Sacramento, and/or employed by CDCR. Plaintiffs are informed and believes his duties include wellness check-ups and reporting on inmates' well-being at regular intervals. He was responsible for safety of inmates, responding to medical requests, maintaining evidence, proper reports, and compliance with relevant law. Plaintiff is informed Defendant displayed gross indifference and is sued in his individual capacity.

26. At all relevant times relevant to this Complaint, California State Prison ("CSP") Officer C. CAVANAUGH, or the person performing his interval check-in role, is an individual believed to reside and/or employed by CDCR in Sacramento County. Plaintiffs are informed and believes he was expressly named as part of a CDCR Form 602 complaint about the incident. His duties include wellness check-ups and reporting on inmates' well-being at regular intervals. He was responsible for assisting inmates, addressing medical requests, maintaining evidence and compliance with all relevant law. Plaintiff is unaware of the proper spelling of Officer Cavanaugh's last name, either Cavanaugh or "Cavvanah".[3]    Defendant Cavanaugh's conduct includes acquiescence in the violations alleged herein. Plaintiff is sued in his individual capacity.

27. At all relevant times relevant to this Complaint, California State Prison ("CSP") Officer NGUYEN[3], or the person performing his interval check-in role, is an individual believed to reside in Sacramento County, and/or employed by CDCR.  Plaintiffs are informed and believes

FOURTH AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

he was expressly named as part of a CDCR Form 602 complaint about the incident. His duties include wellness check-ups and reporting on inmates' well-being at regular intervals.  He was responsible for assisting inmates, addressing medical requests, maintaining evidence and compliance with all relevant law. Plaintiff is unaware of the proper spelling of Officer Nguyen's full and correct spelling of his name. Defendant's conduct includes acquiescence in the violations alleged herein. Plaintiff is sued in his individual capacity.

28. At all relevant times relevant to this Complaint, California State Prison ("CSP), ERIK ALTVATER is an individual believed to reside in Sacramento County, and/or employed by CDCR.  He is responsible for investigating, preserving documents, assisting inmates, addressing proper investigations, maintaining evidence and compliance with all law. Plaintiffs are informed and believe he presented multiple versions and no documents would be preserved. He is sued in his individual capacity based on actions, inactions, or conduct performed under color of law.

29. At all relevant times, California State Prison ("CSP), technician ONOMEN ODIAHI, "RACHEL HUNTER, and LORI CHESTER respectively are individuals believed to reside in Sacramento County, and/or employed by CDCR. Nurses had a duty to check on Decedent in regular intervals. Each is sued in her individual capacity based on actions, inactions, or conduct performed under color of state law. Each is sued in the individual capacity based on actions, inactions, or conduct performed under color of state law.

30. At all relevant times relevant to this Complaint, California State Prison ("CSP) Officer ONOMEN ODIAHI, or the person performing his interval check-in role, is an individual believed to reside in Sacramento County, and/or employed by CDCR.  Plaintiffs are informed and believes he was expressly named as part of a CDCR Form 602 complaint about the incident. His duties include wellness check-ups and reporting on inmates' well-being at regular intervals.  He was responsible for assisting inmates, addressing medical requests, maintaining evidence and compliance with all relevant law. Plaintiff is unaware of the proper spelling of Officer Nguyen's full and correct spelling of his name. Defendant's conduct includes acquiescence in the violations alleged herein. Plaintiff is sued in his individual capacity.

31. At all relevant times, California State Prison ("CSP), LORI CHESTER is an individual

FOURTH AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

believed to reside in Sacramento County, and/or employed by CDCR. Nurses had a duty to check on Decedent in regular intervals. Plaintiffs are informed and believe Nurse "Chester" drafted a report Decedent's heartbeat was asystole, though rigor mortis had commenced. Each is responsible for addressing medical requests, maintaining evidence, investigating, compliance with law.

32. At all relevant times relevant, California State Prison ("CSP), DOES 1 through 5, The identities, capacities, and/or nature of involvement of the defendants sued as DOES 1 through 5 are presently unknown to the Plaintiffs who therefore sue these defendants by fictitious names. Plaintiffs are informed, believe, and thereupon allege that DOES 1 through 5 include individual law enforcement personnel and medical personnel employed by the CDCR and the CDCR's Correctional Health Care Services, and they were involved in some manner and are legally responsible for the wrongful acts and conduct alleged herein. Plaintiffs will amend this complaint to substitute the DOE Defendants' true names and capacities when they have been ascertained. Plaintiffs are informed, believe, and thereupon allege that each DOE defendant is a resident of California. On information and belief, DOES 1 through 5 were and still are residents of the County of Sacramento, California. DOES 1 through 5 are sued in their individual and official capacities.

33. Defendant DOE 1 is an employee of CDCR and the Chief of Mental Health at CDCR Folsom during the time period relevant to the events, actions, and omissions described herein. Defendant DOE 2 is responsible for chairing the Suicide Prevention and Response Focused Implementation Team at CDCR Folsom. Though chairing of the team and supervision of provision of mental health care at CCR, Defendant DOE 1 is responsible for reviewing and implementing CDCR policies and procedures related to suicide prevention at Folsom, and responsible fore ensuring that appropriate corrective actions were taken to address deficiencies in suicide prevention identified by the Coleman Special Master and CDCR's internal review process. On information and belief, Defendant DOE 1 failed to ensure that the Suicide Prevention and Response Focused Implementation Team fulfilled its obligations. On information and belief, Defendant Doe 1 also failed to supervise mental health staff at CMC and implement appropriate procedures and training to ensure adequate completion of treatment planning and suicide risk evaluations for patients with serious mental health needs and risk of suicide.

FOURTH AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

34. Defendants DOES 3 through 5 are additional employees of CDCR including but not limited to correctional officers within CMC, civilian staff, and medical and mental health professionals who were responsible for implementation of CDCR policy and procedures, and the safety and security of inmates, including Johnny Pantoja.  DOES 3 through 5, are believed to be named "Wong", "Phun", "A. Huynh", respectively, are individuals believed to reside in Sacramento County, and/or employed by CDCR.  At least one of these reported Asian American Officers were responsible for performing medical checks, investigative services, or inmate care during the evening and/or morning shifts. In this capacity they were responsible for assisting inmates, addressing medical requests, maintaining evidence and compliance with all relevant law. Upon information, DOES 3 through 5 were involved with the injuries inflicted on Johnny and/or reported but not did not actually perform those wellness checks. DOES 3 through 5 are sued in individual capacity based on actions, inactions, or conduct taken under color of state law.

35. Upon information and belief, DOES 6 through 10 are medical providers whose actions, inactions, or conduct violated the rights of Plaintiffs. DOES 6 through 10 worked during the evening "third" watch, served as psychiatric technicians, nurses, or other duties on a related shift and did not provide proper care, care, reporting, or medical assistance to Johnny resulting in his death. DOES 6 through 10 served in the morning "second" watch when Johnny had requested medical assistance, or early morning "first" watch or related shift, and did not provide proper care, reporting, or medical assistance.  Upon information and belief, DOES 6 through 10 are sued in the official capacity (for injunctive and declaratory relief) and in the individual capacity (for damages) based on actions, inactions, or conduct taken or performed under the color of state law.

36.  Upon information and belief, DOES 11 through 15 are supervisors and/or managers, Investigative Unit staff, agents, employees whose actions, inactions, or conduct violated the rights of plaintiffs. Defendant 11 is an employee of CDCR and the Chief of Mental Health at Folsom during the time relevant to the events, actions, and omissions described herein.  Defendant DOE 12 is responsible for chairing the Suicide Prevention and Response Focused Implementation Team. Through chairing of this team and supervision of mental health, Defendants DOES 11 and 12 are responsible for reviewing and implementing CDCR and California Correctional Healthcare

Services policies and procedures related to suicide prevention, and responsible for ensuring that appropriate corrective action are taken to address deficiencies in suicide prevention identified by the *Coleman* Special Master and CDCR's internal review policy. DOES 13 through 15 informed other inmates of DECEDENT's alleged medical records but would not provide the medical information to the family. These individuals' acts, omissions, misconduct, promulgated, ratified the policies, customs, or procedures allowing for the conditions and behavior that placed Johnny at undue and substantial risk of harm by suicide and resulted in his death.  DOES 11 through 15 are sued in the official capacity (for injunctive and declaratory relief) and in individual capacity (for damages) based on actions, inaction, or conduct performed under the color of state law.

37. Upon information and belief, DOES 15 through 20 are correctional employees involved involved in the alleged force, mistreatment, conduct, misconduct, or omissions resulting in the death of Decedent and were acting under color of state law. The true names and identities of DOE Defendants 15 through 20 are presently unknown.  DOES 15 through 20 and believed to be the causal or contributing factor for Johnny's broken nose, crushed hands, and punctures in his feet. Defendants hold the vast universe of the evidence.  Plaintiffs will seek leave to amend as soon as the true names and identities of these defendants are learned. DOES 15 through 20 are being sued in their individual and professional capacities.

38.  Upon information and belief DOES 1 through 20 are correctional employees, agents, or staff involved in the alleged retaliating, covering up, or otherwise harming plaintiff, including, but not limited to, acting or omitting actions leading up to and prior to his death alleged herein, denying and attempting to deny Decedent's access to medical care, well-being, or life, prescribing contraindicating medications that contributed to his death. DOES 1 through 20 were acting under color of state law. DOES 1 through 20 are being sued in their individual capacities.

39.  Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 20, inclusive, and sues these Defendants by such fictitious names.  At the present time, the identities of DOES 1 through 20 are unknown and not discoverable to Plaintiffs without access to documents within the sole custody and control of Defendants. DOES 1 through 20 are believed to have master footage pertaining to Incident Report 40546 on Facility A and from camera 'FAB1

Dayroom B 1056 ont a CEZ'.  Plaintiffs allege that each of the Defendants named as a DOE was in some manner reasonable for the acts and omissions alleged herein.  At the present time, the precise identities of DOES 1 through 20 are unknown and not discoverable to plaintiffs without access to documents within the sole custody and control of Defendants.  DOES 1 through 20 are sued in their individual capacity. Formal discovery has not begun. Plaintiffs will seek leave to amend this complaint to allege true names, responsibility and capacities when ascertained. Plaintiffs are informed and believes that Plaintiffs' injuries were proximally caused by the acts, omissions, of Defendants. Each reference to named Defendants herein shall also refer to DOES 1 through 20, inclusive.

40. Plaintiffs are informed and believe that each of the Defendants sued herein was wrongfully, deliberately, indifferently, unreasonably, negligently or otherwise responsible for the events and happenings as hereinafter described and proximately caused injuries to Plaintiffs and/or Decedent.

41. Plaintiffs are informed, believe, and thereon allege that each of the Defendants were at all times an agent, employee, joint venturer, co-conspirator, or alter ego of the remaining Defendants, and in doing the things herein alleged, was acting within the course and scope of that relationship. Plaintiffs are informed, believe, and thereon allege that each of the Defendants herein gave consent, aid, or assistance to each of the remaining Defendants, and ratified or authorized the acts or omissions. Each Defendant was an integral participant, jointly and fundamentally engaged in constitutionally violative, unlawful, or tortious activity, resulting in violation of Plaintiffs' rights.

42. The acts and omissions of all Defendants, except those directly employed by CDCR, were pursuant to the customs, policies, practices and/or procedures of the STATE OF CALIFORNIA.

43. Plaintiffs are further informed, believe, and in committing the acts alleged herein, defendants acted knowingly, maliciously, and with reckless or callous disregard for the constitutional rights of plaintiffs, justifying an award of punitive damages against  defendant.

44. Whenever reference is made to any act by Defendants, such allegations and references shall also mean the acts and failures to act of each Defendant, individually, jointly or severally.

## CALIFORNIA CLAIM FILING REQUIREMENT

45. With regard to claims under state law, Plaintiffs complied with California's tort

requirements as set forth in California Government Code §§ 900 et seq. This complaint may also be pled pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure. With respect to any supplemental state claims, Plaintiffs request that this Court exercise supplemental jurisdiction pursuant to 28 U.S.C.§1367 over such claims as they arise from the same facts and circumstances which underlie the federal claims.  Plaintiffs proceed herein.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

46. Plaintiffs repeat and incorporate each and every allegation in prior paragraphs of this Complaint with the same force as if fully set forth herein.

47. Decedent Johnny Pantoja was incarcerated as a jovial juvenile at or about age sixteen (16) years old, initially for six (6) months, yet detained throughout his young life. In spite of his highly anticipated potential release, Johnny was found dead in custody at the mere age of thirty-one (31).

48. On June 17, 2022, at or about 6:45 a.m., John "Johnny" Pantoja was declared dead.

49. Plaintiffs are informed and believe video shows approximately twenty-two (22) CDCR officers or agents encircled Johnny's body outside of his cell, believed to be A- 114 and stood in a line obscuring the cameras. Plaintiffs do not yet know the full identity or specific roles of each.

50. Plaintiffs are informed and believe that Johnny's nose was broken with visible trauma throughout his body, including punctures to his hands, fingers, and toes stepped on. His extremities are believed to be purplish, with an extended, bloated stomach as rigor mortis set in.

51. While at CDCR Johnny Pantoja was diagnosed with a mental illness and disability and medical impairments that limited and/or substantially limited his mental, medical, or physical health condition as defined under the ADA, 42 U.S.C.§12131(2), and under section 504 of the Rehabilitation Act ("RA") of 1973, 29 U.S.C.§794, 28 C.F.R.42.540(k) as such, JOHN PANTOJA qualified as an individual with a mental and physical disability under California law and met the essential eligibility of CDCR programs to provide access to medical and mental health care for inmate patients in the state prison. Mental health assessments reevaluated that JOHN PANTOJA had suicidal ideations, schizoaffective disorder, and anxiety, and neuropathic pain.

52. Video footage shows an estimated twenty-two (22) employees of CDCR surrounding Johnny's body within minutes at or about the time of the declaration of his death at 6:45 a.m.

Their names, titles, roles, duties, have not been specified or identified to Plaintiffs.

53. Plaintiffs allege Decedent sought medical help and believe to have complained of mistreatment, and unlawful actions, omissions, or gross negligence, leading to his untimely death under the color of state law. Correctional officers, staff, supervisors, failed to adopt and implement policies and practices of implemental the wellness checks to prevent violations of the cruel and unusual punishment provisions of the Eighth Amendment of the U.S. Constitution. Plaintiffs are informed and believes Defendants knew or should have known the dangers and yet simply ignored Decedent's pleas and were grossly indifferent to Decedent's requests for medical attention.

54. In 2022, the California Department of Corrections and Rehabilitation's thirty-three (33) correctional facilities reported three hundred eight-nine (389) in custody deaths, including twenty-one (21) deaths by suicide, fifty-three (53) overdoses, twenty-five (25) homicides from inmate on inmate violence. (*See, e.g.* California Correctional Health Care Services  2022 Mortality Review Analysis; Analysis of 2022 California Correctional Health Care Services Inmate Mortality.)

**A.** **Defendants knew or should have known, had a Duty to Protect, and had been Required to Remediate Known Deficiencies in Mental Health Treatment**

55. Long before Johnny Pantoja's deaths, each of the individually named defendants and DOES 1 through 20 from the California Department of Corrections and Rehabilitation and the California Correctional Health Services knew that there existed a great gross and deliberate indifference to the safety and protection of the inmates who were in the government's custody within CDCR's correctional facilities, including Folsom in Sacramento.

56. Plaintiffs are informed and believe California Department of Corrections and Rehabilitation has a long history of committing alleged human rights abuses that are prohibited by law. This is particularly problematic as CDCR is the second largest corrections facility in the United States.

57. Plaintiffs are informed and believes California has an incarceration rate of approximately 549 per 100,000 people, locking up a higher percentage of its people than almost any democratic country in the world. CDCR– the state's largest agency, with a proposed 2023-2024 budget of $14.5 billion spends immense amount of taxpayer-funded resources to deprive those in its care.

58. CDCR asserts that its mission is, "To facilitate the successful reintegration of the

individuals in our care back to their communities equipped with the tools to be drug-free, healthy, and employable members of society by providing education, treatment, rehabilitative, and restorative justice programs, all in a safe and humane environment." By disregarding mental health standards and guidance, CDCR undermines its rehabilitative mission – and does so unlawfully.

59. The individuals named in the present lawsuit were repeatedly put on notice of the great dangers which existed within the CDCR's correctional facilities through the long history of in-custody deaths as a result of the CDCR's failure to provide necessary and adequate treatment to inmates in need of medical and mental health care. The Court in the federal class action *Plata v. Schwarzenegger* and *Coleman v. Newsom* (2:90-cv-00520-KJM-DB (hereinafter the "*Coleman* Class Action") appointed a Special Master in 1995 to monitor the provision of mental health treatment and suicide prevention in the CDCR's correctional facilities. Pursuant to the consent decree in *Coleman,* the Special Master is required to file regular monitoring reports with the Court to ensure that the CDCR is fulfilling its constitutional obligations to inmates under the Eighth and the Fourteenth Amendments.

60. In 1995, the *Coleman* Court rule that the State of California, through CDCR was violating the Eighth Amendment of the U.S. Constitution by failing to provide adequate mental health treatment to inmates with serious mental illness. *See Coleman v. Wilson,* 912 F. Supp. 1282 (E.D. Cal. 1995). The *Coleman* Court identified numerous ways in which CDCR failed to provide constitutionally adequate care, including "incomplete or nonexistent" treatment plans". *See* 912 F. Supp. 1283. The *Coleman* Court ordered CDCR to correct the deficiencies and provide adequate mental health care for inmates with serious mental illness.

61. In *Plata v. Schwarzenegger,* the Court found CDCR's prison medical conditions were in violation of the Eighth Amendment of the United States Constitution's prohibition against cruel and unusual punishment. Case Nos. C01-1351 THE, 2005 U.S. Dist. LEXIS 43796, 2005 WL 2932243 (N.D. Cal, 2005). After repeated violations of a stipulated agreement and an order for injunctive relief, as a person a week was dying in state prison due to inadequate access to healthcare, CDCR was held in civil contempt and its health care system was also placed in a receivership administered by the federal government ("Federal Receiver" or "Receiver") in 2006.

62. Individual Defendants named in this lawsuit were repeatedly put on notice of the dangers for persons in custody, which existed within CDCR's correctional facilities. Concurrent with *Plata*, in *Coleman v. Brown*, CDCR's mental health services was also found to have violated the Eighth Amendment of the U.S. Constitution's prohibition against cruel and unusual punishment. Case No. 2:90-cv-0520 LKK DAD (PC), 912 F. Supp. 1282 (E.D. Cal, September 13, 1995).

63. In December 1995, the *Coleman* court appointed a Special Master who is required to-date monitor and file regular reports on CDCR's compliance with applicable guidance under the Eighth and Fourteenth Amendments. While *Coleman* was in active litigation, the special master submitted at least sixteen (16) interim reports, with later reports showing a troubling reversal in the progress of the remedial efforts of the preceding decade. "The adequacy of suicide prevention" was one of the many areas of mental health treatment the Special Master was ordered to review.

64. Despite issuing hundreds or more remedial orders, the *Coleman Court* found that CDCR and its officials had not yet adequately addressed the deficiencies found. The Court ruled that CDCR continues to violate the Eighth Amendment by failing to provide mental health treatment. The case is still active, with regular audits and order issued at the time of Johnny's death.

65. Courts have overseen lawsuits and class actions that have exposed CDCR's instigation of race wars, gladiator fights, suppression of free speech, brutal conditions against its inmates, or disregard of mental health care in which CDCR has not fully complied, including on or about May 1, 2023, a Federal Judge ruled the State of California will be fined for each death after years of notice of and continued gross disregard for the mental health treatment of inmates.[1]  CDCR has

---

[1] The class action is listed to show notice and knowledge of court-ordered programs and mandates.  *See, e.g., Ralph Coleman* et al., v. *Gavin Newson*, (E.D. Mar. 1, 2023, No. 29:90-cv-0520 KJM DB P); *See also Castillo v. Alameida*, (N.D.Cal. Nov. 15, 2004, No. 3:94-cv-02847-MJJ); *Mitchell v. Cate* (E.D.Cal. Sep. 8, 2015, No. 2:11-cv-1240 JAM AC P); *Ashker v. Brown* (N.D.Cal. Mar. 13, 2012, No. C 09-5796 CW); *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995); *Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882 (E.D. & N.D, Cal. 2009); *Brown v. Plata*, 563 U.S. 493 (2011); *Coleman Brown*, 938 F. Supp. 2d 955 (E.D. Cal. 2013); *Coleman v. Brown*, 28 F. Supp. 3d 1068 (E.D. Cal. 2014).
3. The doctrine of *idem sonans* presumes the officer's identity despite any misspelling.
4. United Nations Office of the High Commissioner for Human Rights. United States: Prolonged Solitary Confinement Amounts to Psychological Torture, says UN Expert. Published February

been alleged to misuse common policies surrounding security threat validations, solitary confinement and gross disregard for wellness checks or well-being of the inmates; there have been statewide hunger strikes to nonviolently protest indefinite solitary confinement in the Solitary Housing Unit (SHU). The first strike drew 6600 participants statewide, the second, 12000, and a third, 30000 participants – the largest prison hunger strike in history.

66. As a result of the Special Master reporting process and federal court orders, CDCR officials and individually named Defendants knew or should have known that CDCR policies and procedures in relation to mental health treatment and suicide prevention were inadequate. The consistent findings, on information and belief, are reviewed directly by CDCR statewide chain of command and the leadership of Folsom, including the Secretary of CDCR, the Undersecretary of Health Care Services, the Deputy Director of Statewide Mental Health Program. Each of the individually named defendants in this lawsuit failed to provide sufficient oversight to ensure that staff at its CDCR facilities including Folsom, were adequately trained in suicide prevention or to ensure CDCR mental health treatment and suicide prevention policies were implemented.

67. The history is enumerated herein to show that Defendants were on notice and Detainee was Denied Adequate Mental Health Care and was Not Protected from Suicide Hazards Despite Obvious Signs of Suicidality and Self-Harming Behavior During His Incarceration.

**B.** _**Coleman Special Master Identified On-going Severe Deficiencies in Health Treatment and Suicide Prevention in 2022**_

68. To date, Plaintiffs are informed and believe CDCR continues to foster an atmosphere that ignores, degrades, dehumanizes and even turned deadly against DECEDENT.

69. Plaintiffs are informed and believes witnesses have complained of Johnny's death, these inhumane conditions, and believe they are still experiencing retaliation and unsafe conditions.

70. With on-going concerns, Plaintiff's family heard his son's inhumane treatment and prolonged isolation as a form of 'rehabilitation'. Such concerns were left unaddressed.

71. In 2022, 128,209 discrete individuals had been confined at CDCR. This year, at least 19

28, 2020. https://www.ohchr.org/en/press-releases/2020/02/united-states-prolonged-solitary-confinement-amounts-psychological-torture. _Accessed_ at: March 13, 2025.

individuals were listed as death by suicide with 89% enrolled in the state mental health program with Hispanic men representing the majority and the suicide rate of 19.6 of 100,000 inmates.[2] Those numbers increased after Johnny's death with 30 suicides and 405 in custody deaths in 2023.

72. Plaintiffs are informed and believes Defendants withheld or destroyed documents, reported Johnny's private medical status to others and separated witnesses relating to alleged facts supporting negligence, medical neglect, falsified reporting, assault prior to Johnny's death.

73. Decedent was incarcerated for long periods of time including for extended periods in solitary confinement or indefinite isolation in the last five (5) years in the California State Prison Sacramento. The United Nations Special Rapporteur has found prolonged time periods of solitary confinement have been found tantamount to "torture". Office of the High Commissioner, United Nations Human Rights. "United States: Prolonged solitary confinement amounts to psychological torture, says UN expert." (February 28, 2020) He was, against his own volition, forced to take CDCR prescribed medications and spend most of his time in the Solitary Housing Unit (SHU).

74. When Johnny was placed in prison facing prolonged solitary confinement and / or administrative segregation unit he developed a CDCR history of mental health issues, including diagnoses of schizoaffective disorder, suicide attempts, complaints of prescribed medications that altered his jovial personality, placed in segregated housing, solitary confinement, suicide watch, denial of visitation rights, complaints of negative interactions with multiple CDCR officials that exacerbated other mental, psychological, and physical distress.

**C. Supervisory Defendants knew that Mental Health Treatment and Suicide Prevention were Inadequate and Posed a Substantial Risk of Serious Harm to John Pantoja**

75. Plaintiffs are informed and believes due to the prolonged confinement and inhumane treatment, Johnny experienced disabilities known to the officers. Decedent's history of mental health during his incarceration were documented in his medical and mental health records.

76. The Mental Health Service Delivery System at the Enhance Outpatient Program and

---

[2] California Department of Corrections and Rehabilitation. 2022 Annual Report on Suicides and Suicide Prevention Efforts in CDCR. https://cchcs.ca.gov/wp-content/uploads/sites/60/2022-Annual-Report.pdf. *Accessed* at: March 13, 2025.

CDCR employees took away his visitation rights, destroyed his personal items, medicated him with drugs involuntarily, which would make him feel worse and physically ill.  Upon information and belief, Decedent submitted requests to speak with a therapist and/or psychiatrist throughout his time detained.  He suffered from schizoaffective disorder, anxiety, and depression.

77. Throughout his tenure and increasingly, in or about 2022, Johnny complained to his family about Defendant officers and employees' threatening and abusive behavior toward him.

78. Johnny complained about being forced to take medications that were harmful to him.

79. Officers, correctional officers, corrections staff, supervisors, and DOES 1 through 20 violated policies and procedures of CDCR Folsom and Title 15 which caused Johnny's death.

80. Plaintiffs are informed about complaints that Defendants would ransack and destroy the property of Johnny, with the intent of entering his cell was to start a fight with the DECEDENT.

81. On or about January 27, 2022, Johnny reported to an official that he was "suicidal" alleging officials busted into and ransacked his cell in which they threw out his books, letters and pictures.

82. Throughout 2022, Johnny requested help for his mental health services and address his depressive symptoms. Plaintiffs are informed and believe that Defendant officials knew or should have known of Johnny's declining mental health and suicidal ideations.

83. It is believed, and informed that Johnny had personal belongings like a new television that Johnny and witnesses complained Defendants would break or destroy.

84. Throughout this time the medical providers were aware of Decedent's mental health issues the officers' alleged discriminatory and retaliatory behavior, and suicide ideation.

85. Plaintiffs are informed and believe Decedent was victim to threatening and abusive behavior by the correctional officers responsible for Johnny's care.

86. On or about May of 2022, Johnny's family spoke with him, and he was very much looking forward to their upcoming family visit and upcoming release.

87. On or about June 1, 2022, Johnny completed a "Responsible Thinking" course and looked forward to the future and life outside Folsom.

88. On or about June 8, 2022, Johnny called his father Amado Pantoja and repeated enthusiasm for the family visit but expressed concern about DOE officers' improper and abusive behaviors.

89. On information and belief, in the days and weeks leading up to his death, Johnny was identified as an immediate threat to the safety of himself.

90. On or about June 16, 2024, Johnny Pantoja was transferred to the CDCR medical clinic with complaints of blunt-force type injuries, breathing, asthma-like symptoms, cough-respiratory distress, COVID, neuropathic pain/body pain, swelling to his knee and leg, and/or partial seizures.

91. Plaintiffs are informed and believes Johnny was placed in a tiny "holding cage" and shackled with restraints in a small sally port area.

92. Plaintiffs are informed and believe Decedent pled for help stating he was suicidal.

93. Defendant CDCR employees returned him to his cell with an unprotected fixture and sheets to injure himself despite his stated and obvious declining mental and physical health.

94. Unidentified correction officers, DOES 1 though 20 were assigned to monitor the video feeds from the cameras located inside housing Units, where Johnny's death occurred.

95. Corrections officers, DOES 1 through 20 had an obligation to monitor the video feeds to ensure inmates did not engage in prohibited conduct, including acts of violence, detrimental to the safety of inmates or self-harm. The surveillance cameras located inside Unit A and the monitors located in the central command center were operational on June 16 and June 17, 2022.

96. Correctional officers, corrections staff, supervisors, and DOES 1 through 20 acted with reckless disregard or gross indifference to the safety of Decedent and inmates when they did not monitor the live video surveillance showing suspicious activity or blatant disregard for requests for help that should have triggered intervention by properly trained and supervised officers.

97. The supervisory Correctional officers failed to properly train the subordinate Correctional officers regarding the responsibilities associated with their respective employment positions and that the subordinate correctional officers were properly performing their duties.

98. Plaintiffs are informed and believes multiple witnesses saw or heard Johnny plead for medical help and exclamations he was suicidal with no response or wellness checks from DOES 1 through 20; witnesses expressed dismay that DOE officers still have jobs as the family remains heartbroken over Johnny's death.

99. Eventually, witnesses heard or saw a swarm of DOE Defendants pull Johnny out of his cell.

Witnesses are informed and believe the sheer number was to intimidate the other inmates and 'make an example' which was wantonly and willfully inflicted with reckless disregard to safety.

100.  That morning, Johnny Pantoja's family heard at least three conflicting, confusing, and bizarre stories, alleging blunt force trauma with pressure to the chest-neck on the floor at or about 7:30 a.m., a wire around his neck within the hour, a suicide by hanging with a sheet tied around his neck at 9 or 10 a.m.; thereafter, there was a suggestion of a medical overdose and beating.

101.  Decedent's death was investigated by officials such as one named Eric with the unknown but possible last name 'Altvatter' or "Altvater" observed Johnny had looked great and healthy the day prior to his death.  Plaintiffs believe Defendants ERIK ALTVATER claimed there will be no video evidence, and no autopsy would be necessary and would not provide any documents.

102.   Plaintiffs are informed and believes CDCR Defendants withheld and refused to provide Johnny's full inmate records or possessions including documents such as journals, daily logs, correspondence, letters to the family; instead, blank journals were returned in pieces or ripped to shreds; legal documents, reports and complaints, which would have provided additional facts for this Complaint and identified specific individuals responsible for violations of Decedent's rights.

103.  Plaintiffs are informed and believes witnesses reached out to the family and plaintiff filed a letter of preservation of documents; at least one inmate witness filed a 602-grievance complaint and complained to medical providers and officials shortly after the incident to preserve the videos relating to the facts and circumstances surrounding Johnny's death.

104.  Inmates reported on a commotion and heard Johnny crying out for help and insistence he would commit suicide if he did not receive help.

105.  Plaintiffs are informed and believes Johnny's loved ones asked CDCR if Decedent "was murdered", to no response other than his belongings would be destroyed or not kept.[3]

---

4. Plaintiffs are informed and believes there have been alleged in custody beatings, death, or homicides under suspicious circumstances relating to or in including in or about Johnny's unit, 'New Folsom', or CDCR including as illustrative or representative examples, but not limited to: CSP Sergeant 56 year old Kevin Steele after alleging corruption (8/20/2021), CSP Sacramento

106.   A CDCR medical provider believed to be named 'Dr. Cornish' contacted the family seeking further information and opined the medical and psychological records did not make sense.

107.   Plaintiffs are informed and believes doctors noted signs of foul play or medical overdose with toxicology believed to be contraindicating prescriptions: buprenorphine, norbuprenorphine, naloxone, caffeine, opiates, morphine, naloxone, oxcarbazepine metabolite, codeine, mirtazapine, hydroxybupoprion, hydrocodone, gabapentin, pregabalin, oxcarbazepine, oxcarbazepime.

108.   Plaintiffs are informed and believes autopsy findings include: ligature mark partially on the neck; focal hemorrhage of the right omohyoid muscles; parallel abrasions, suabautaneous hemorrhage of the right upper back.  During the autopsy multiple body parts were completely removed including a cranial removal, the neck cut up with muscles removed, the tongue removed with bloated, swollen, 'pregnant' stomach suggesting rigor mortis, body parts removed on blunt trauma, omohyoid muscles, blood, vertebrae up and down the spine, and opiate receptors.

109.   Though the correctional officers and nurses saw clear signs of death, they continued to handcuff, gather equipment and shields, and detain the dead or near dead body reflecting a reckless and wanton disregard and/or deliberate indifference for the safety of Johnny.

110.   In response to a family request, Plaintiffs recount a CDCR official believed to be named Bill Davies remarked DECEDENT does not appear in the prison system's medical records.

111.   Plaintiffs are informed and believes Johnny's body was returned with his fingers crushed,

_____

Guard, 30 year old Valentino Rodriguez (2020), 3 guards were charged and convicted of 65 year old Ronnie Price's murder (9/15/2016), 37 year old Deandra Lewis (1/2022), 33 year old Nathan Marcus (3/26/2022), 22 year old Camilo Banoslopez (5/6/2022), 52 year old Wayne Caskey (7/22/2022), 36 year old Felipe Rodriguez (10/4/2022), 42 year old Joseph Horne (1/21/2023), 53 year old Edward C. Bergman (5/1/2023), 46 year old Mario Rushing (5/01/2023), 42 year old Michael Olivo (1/26/2023), or 34 year old Rodrick Roman Castro (10/24/2017). These factual allegations, including the dates and names, are approximated as the Pantoja family have not received responses to their information requests relating to Decedent Johnny and other similarly situated scenarios.

FOURTH AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

and visible bruising to his neck, face, and limbs.

112.   Plaintiffs are informed and believes that DECEDENT and other inmates, known and unknown, had complained about guards' abuse or mistreatment of himself and other prisoners.

113.   Though the specific facts are unknown as the family has requested Johnny's records of medical; psychological; incident reports; assault; complaints about the officers and were refused.

114.   By example, Plaintiffs are informed and believes Sergeant Kevin Steele, who worked from 2008 until his suspicious death in 2021, wrote memos about corruption and harassment concerns to top prison officials, including directly to Warden Lynch, in which he alleged that rogue guards in the investigations unit had faked documents and planted drugs and weapons on inmates to obtain more overtime, spread false rumors and relayed private information from inmates' files to other inmates in violation of department policy, and "…have been directly involved in the killing of a CSP-Sacramento inmate" with "indifference" to the "victimization" of in custody persons.

115.   Plaintiffs are informed and believe CDCR Defendants received complaints of inmates being beaten with fists or batons, sprayed with pepper spray, shot with rubber bullets, and force.

116.    Plaintiffs are informed and believes witnesses made and filed complaints Johnny had been crying out for help which was ignored by Defendant officials and medical providers.

117.   The manner in which Defendants interacted and imprisoned DECEDENT constitute dangerous conditions. Defendant CDCR's deputies and officials had a duty to protect Decedent from violence, unsafe conditions, or gross negligence that harmed him. Defendants knew that Decedent faced a substantial risk of serious harm if they ignored his pleas, returned him to his cell, and recklessly disregarded that risk by failing to take reasonable measures to abate it, placing him in a cell with sheets, unprotected fixtures, and materials in which he could injure or kill himself.

118.   Defendants have a duty to do wellness checks at regular intervals including recommended not to exceed fifteen (15) minutes, "Observation Status" checks every thirty (30) minutes, even though DOE Officers did not do those required checks, pretended to do so, or refused.

119.   Unidentified corrections officers, DOES 1 through 20, were assigned to monitor the video feeds from the cameras located inside the units, where Decedent's death occurred. DOE officers had a duty to monitor those feeds to ensure that inmates were not subjected to prohibited conduct,

policies were implemented, and no acts that may harm prison security or inmate safety occurred. The command center was or should have been operational on June 16 and June 17, 2022.

120.   Correctional officers, corrections staff, supervisors, and DOES 1 through 20 acted with reckless disregard for the safety of Johnny Pantoja and other inmates when they did not monitor the live video surveillance, disregard the required healthcare protocols and should have observed suspicious, unconstitutional, or unlawful behavior against DECEDENT that should have triggered intervention by properly trained, supervised and diligent corrections officers.

121.   Defendants Warden J. LYNCH as the chain of command, the supervisor correctional officers have failed and fail to train the subordinates.

122.   Defendants fail to properly supervise the subordinate correctional officers to ensure that the subordinate correctional officers were properly performing their duties.

123.   These supervisory correctional officers were responsible for the health and safety of John Pantoja because he was in their custody, they had "stripped [him] of virtually every means of self-protection and foreclosed his access to outside aid." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994).

124.   The supervisory correctional leadership including Defendants Warden Jeffrey Lynch, past Secretary Kathleen Allison, current Secretary Jeffrey Macomber, the supervisory officers may not delegate the constitutional duties they owed to JOHN PANTOJA to subordinate employees.

125.   As a result, the supervisory correctional officers' actions and inactions (deliberate indifference) were a direct cause of JOHN PANTOJA's death.  Defendants knew or should have known that the training, supervision, policies, procedures, and customs for custodial staff, medical staff and mental health clinicians were not adequate to ensure compliance with CDCR policies and procedures regarding the provision of adequate mental health care and suicide prevention.

126.   As a direct and proximate cause, the supervisory correctional officers' actions, DOES 11 through 20, JOHN PANTOJA suffered injury, trauma, physical pain, and a horrific death.

127.   Johnny's friends and neighbors were able to hear and/or see the incident(s).

128.   Plaintiffs cannot presently state in detail the full details of what transpired because DOE defendants would not allow Johnny's family to inspect the actions that were being taken against Johnny nor have the full investigative reports, video surveillance or camera footage, or

other records been provided. Notably, as the recordholders have not released or provided full reports or complete records, Plaintiffs' allegations are incomplete and upon information and belief.

129.  Plaintiffs are informed DOE Defendant Officers used force without justification, ignored Decedent's cries and pleas for help, and those of higher rank, failed to intervene to prevent DOE officers from using unlawful force or deliberately ignoring Decedent with gross indifference. DOE Defendants, and each of them, were an integral participant in these acts or omissions.

130.  Prison officials have a duty to protect prisoners from violence at the hands of others or or self-injury. The failure of prison officials to protect inmates from attacks, deliberate indifference, or reckless disregard for the health, welfare, or safety of DECEDENT may rise to an Eighth Amendment violation when: (1) the deprivation alleged is objectively, sufficiently serious and (2) the prison officials had a sufficiently culpable state of mind, act with deliberate indifference.  Deliberate indifference entails something more than negligence but is satisfied by less than acts or omissions for the purpose of causing harm or knowledge that harm will result.

131.  All Defendants' deliberate indifference for DECEDENT's serious and life threatening medical needs, their denial of necessary and appropriate medical and psychiatric care, their failure to provide competent mental health care and treatment, their failure to transfer Decedent for inpatient hospitalization in direct violation of a court order and/or their failure to admit him to an appropriate hospital, their reckless disregard for his high risk of others' being a danger to himself which resulted in his death, their intentional decision to place him in a cell with dangerous materials without adequate monitoring of the cell, and the failure to take any reasonable available measures to abate the risk to DECEDENT of injuring himself or being killed, and the tortious, unconstitutional and/or otherwise wrongful conduct causing his death.

132.  Defendants failed to properly and adequately monitor and care for DECEDENT's safety to abate the risk of injury or death, despite the fact a reasonable officer would have appreciated the high risk to Decedent due to his untreated mental disabilities, and declining physical health.

133.  At all material times, and alternatively, the actions and omissions of each Defendant were intention, and/or wanton and/or willful and/or conscious shocking, and/or reckless, and/or callous and/or malicious and/or deliberately indifferent to Plaintiffs' and DECEDENT's rights,

and/or grossly negligent, or negligent.

134.   The following wrongful conduct, all of which were conducted deliberately and with deliberate indifference to Johnny's health, safety and welfare, proximately caused this tragedy:

a.  The CDCR officers acted pursuant to a policy, practice, and/or custom of not providing reasonable accommodations for the physically-mentally disabled and infringing the rights of in custody persons through the use of force without legal justifications;

b.  The responding officers failed to adequately train their personnel to appropriately and safely respond to and deal with situations involving individuals suffering from psychosis, mental illness, and/or mental disabilities (whether permanent or temporary).

c.  Plaintiffs are informed and believe Defendants CDCR, and their managerial policymakers failed to equip CDCR employees with reasonable techniques, tactics, and/or training.

d.  CDCR's final policymakers ratified the acts of CDCR employees, including the responding correctional officers or medical providers.

e.  Plaintiffs are informed and believe that, when learning of the events giving rise to these claims, Defendant CDCR's final policymakers ratified the acts of CDCR employees, including the responding officers or medical providers.

f.  The CDCR defendants discriminated against, and failed to accommodate Johnny's disabilities, because of their perceptions of Johnny's disability and/or mental health.

g.  Plaintiffs are informed and believe that, when learning of the events giving rise to the claim, the CDCR final policymakers ratified the acts of CDCR employees, including the responding officers or medical providers.

h.   The responding officers and/or medical responders failed to use appropriate methods, and failed to provide necessary and adequate medical care, and thus were a proximate cause of Johnny's death, with the cause of death as demonstrating gross negligence or indifference.

i.  Medical providers and/or correctional officers were grossly indifferent to Johnny's health.

j.  Defendant Correctional officers' staff and supervisors DOES 1 through 20 failed to notify JOHN PANTOJA's parents before making the alleged suicide public to inmates.

k.  Defendant Correctional officers and corrections staff and supervisors DOES 1 through 20

violations of Plaintiffs' and Decedent's due process rights with deliberate indifference separate from, officers and corrections staff and supervisors' and DOES 1 through 20 attempted interference, interfered with, and violated Plaintiffs' and Decedent's rights.

135.   Plaintiffs are informed and believe JOHN PANTOJA was denied the benefits of the services, programs, and activities of CDCR, and was denied accommodation for his disabilities, which deprived him of safety, necessary care, and mental health and medical health programs and services, which would have provided planning and delivery of treatment, follow-up, and supervision. This denial of accommodation, programs, or services was the result of his disability in that he was discriminated against because he was mentally ill, and gravely disabled, in that he suffered from conditions in which a person, as a result of mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter and is unable to advocate for himself; and, JOHN PANTOJA had mental impairments that substantially limited one or more of his major life activities.

136.   Plaintiff does not have the names of the specific programs as discovery has not commenced.

137.   As a result of the conduct, acts, and misconduct alleged above by Defendants was both a cause-in-fact and proximate cause of the Decedent to be deprived of his civil rights protected under the United States Constitution and his death, entitling Plaintiffs, and each of them, for the loss of his love, society, companionship and support, and damages, of funeral, and burial expenses.

138.   As a direct and proximate result of each Defendants' acts and/or omissions, Plaintiffs sustained the serious injuries and damages, past and future, including, but not limited to:

a.   Wrongful death of JOHN PANTOJA;

b.   Loss of support and familial relationships, including loss of love, companionship, comfort, affection, society, services, solace, and moral support;

c.   Emotional distress from. the violations of their personal Constitutional rights, including grief, sorrow, anxiety, sleeplessness, humiliation, and indignity;

d.   All other legally cognizable special and general damages;

e.   All damages and penalties recoverable under 42 U.S.C. §§1983 and 1988, California Civil

Code §§52 and 52.1, and as otherwise allowed under California and United States statutes, codes, and common law according to proof.

139.   Plaintiffs natural father AMADO PANTOJA and natural mother MARIA DE LOURDES VERA each file individually, and is successor in interest pursuant to Cal. Civ. Proc. Code § 377.11 et seq. as the natural parents of DECEDENT. Plaintiffs are informed and believes prior to his detention and upon release Johnny made contributions relating to necessaries of life.

140.   As a direct and proximate cause of Defendants' acts and/or omissions as set forth above, Plaintiffs, as co-successors in interests sustained injuries and damages, past and future.

141.   Johnny's death is a profound unimaginable and immeasurable loss to his family

## FIRST CLAIM FOR RELIEF

### Excessive Use of Force 42 U.S.C. § 1983

(By ESTATE OF JOHN PANTOJA against Officers CSP NGUYEN; CSP CAVANAUGH; DOES 15 through 20)

142.    Plaintiffs repeat and reallege each and every allegation as though set fully herein.

143.    Plaintiffs bring this survival claim as Decedent's successor-in-interest under Cal. Civ. Proc. Code §377.30 and §377.34 against named and unknown defendants in individual capacities.

144.    Plaintiffs allege a survival action under Cal. Civ. Proc. Code § 377.20 and Cal. Civ. Proc. Code §377.34 which provides "in an action or proceeding by a Decedent's personal representative or successor in interest on the Decedent's cause of action, the damages recoverable may include damages for pain, suffering, or disfigurement if the action or proceeding was granted a preference pursuant to Section 36 before January 1, 2022, or was filed on or after January 1, 2022."

Plaintiffs are informed and believe that Decedent had puncture wounds in his hand and feet, a broken nose, and other injuries in spite of a Fourth Amendment as incorporated to state actors under the Fourteenth Amendment right to be free the excessive use of force by officers.

145.    Plaintiffs allege Defendants violated Decedent's Eighth Amendment right to be free excessive force when they used unreasonable force on Johnny and deprived him of equal protection to be free from punishment without due process; or cruel and unusual punishment.

146. Plaintiff is informed and believes witnesses remarked on Defendants CSP Officers NGUYEN;

CAVANAUGH; DOES 15 through 20, and each of them, acted maliciously and wantonly for the purpose of causing harm, and not in a good faith effort to maintain or restore discipline.

147.   Defendants, and each of them, were acting under color of law and an integral participant in the gross negligence or deliberate indifference to be free from excessive force.

148.   As a proximate result of the foregoing, Johnny sustained great pain and suffering and suffered pre-death physical pain and emotional distress up to the time of his death, loss of enjoyment of life, loss of life, loss of earning capacity, and pre-death pain and suffering.

149.   As a direct and foreseeable result of these officers' actions and inactions, Johnny died.

150.   Johnny suffered special and general damages, according to proof at trial. Defendants' conduct was willful, wanton, malicious, and done with reckless disregard for his rights and safety.

## SECOND CLAIM FOR RELIEF

### Deliberate Indifference to Prisoner's Conditions of Confinement / Deprivation of Medical Care

### (U.S. Const. Amend. VIII; Survival Action - 42 U.S.C.§1983)

(By Plaintiff Estate of JOHN PANTOJA against Defendants
J. LYNCH; CSP NGUYEN; CSP C. CAVANAUGH; CSP OFFICER R. RIOS, O. ODIAHI,
E. ALTVATTER, and DOES 1 through 20)

151.   Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Complaint with same force and effect as if fully set forth herein.

152.   Decedent had a right to be free from "cruel and unusual punishments." This included the right to have reasonable medical treatment especially in a life-threatening scenario.

153.   Decedent faced a reasonable risk of serious harm.

154.   To the extent applicable, Plaintiff includes the protections of the Bane Act related to the Eighth Amendment.

155.   Defendants J. LYNCH; CSP NGUYEN; CSP C. CAVANAUGH; CSP OFFICER R. RIOS, O. ODIAHI, E. ALTVATTER,  and DOES 1 through 20, knew or should have known that the provision of mental health care fell far short of the minimum elements of a constitutional system where Decedent's medical condition, including psychiatric needs were serious, but

treatable, and knew or must have known that Johnny required access and delivery to urgently needed healthcare and were on notice of these failures;

156.   Defendants J. LYNCH; CSP NGUYEN; D. TOCHE; A. MEHTA; CSP C. CAVANAUGH; CSP OFFICER R. RIOS, O. ODIAHI, E. ALTVATTER and DOES 1 through 20, failed to promulgate, implement, or enforce adequate policies, procedures, practices, and training to ensure minimally adequate health treatment at CDCR, including corrective training expressly ordered to be implemented by the *Coleman* Court.

157.   Defendants J. LYNCH were on notice for years prior to the death of John Pantoja and further knew or must have known that Decedent was vulnerable to injury, suffering, and attacks by other inmates, and that if reasonable measures were not taken to abate that risk, Decedent would suffer serious bodily injury and/or death.

158.   Defendants J. LYNCH,, DOES 5 through 15 also failed to properly train and supervise custody staff regarding policies, procedures, and practices necessary for the provision of adequate mental health care, including those policies and procedures that had been ordered by the Court.

159.   Defendants J. LYNCH,, DOES 1 through 20 failed to implement the court mandated suicide watch programs and had a duty to provide Decedent with reasonable security, safe, appropriate, and adequate housing, monitoring to accommodate his mental, physical health conditions, and vulnerability to possible injury, self-harm, or death.

160.   At or about 6:45 a.m. Decedent was determined dead and rigor mortis had set in. Upon information and belief, rigor mortis appears at least two hours after death.  This would conflict with Defendants' contention that Johnny was observed and/or checked within fifteen (15) minutes at or about 6 a.m. Notably, this would also conflict with CDCR's requirement of the "Observation Status" inactive, which are mandatory every fifteen (15) minutes.

161.   At or about 7:03 a.m. on June 17, 2022, Defendant Warden Jeffrey Lynch was notified of DECEDENT's death. On information and belief, the staff were not admonished, nor did Defendant Lynch require changes. Defendants knew of the risks and medical needs and disregarded it by failing to take reasonable measures to address it.

162.   Moreover, CDCR's own policies require that inmates housed in administrative

segregation be observed at least 30-minute intervals.  In fact, CDCR implemented the Guard One system to electronically verify welfare checks of all inmates in administrative segregation.

163.   Prior to Johnny's death in June of 2022, Defendants, as CDCR chain of command responsible for the implementation of policies, procedures, and training regarding provision of mental health care and suicide prevention for CDCR statewide had been ordered by the *Coleman* Court to correct specific deficiencies in  the provision of mental health care at CDCR that created a serious risk of harm, including suicide, for inmates at Folsom.

164.   Defendants CSP C. CAVANAUGH; CSP OFFICER R. RIOS, O. ODIAHI and DOES 1 through 20 also failed to adequate supervise and implement the provision of mental health services at Folsom, violating the constitutional obligation to ensure that inmates entrusted to their care receive necessary treatment and that the Coleman orders were being implemented.

165.   Defendant  J. LYNCH failed to adequately supervise the provision of mental health services at CDCR, violating constitutional obligation to ensure inmates entrusted to their care receive necessary treatment, standard of care, and the *Coleman* orders were being implemented.

166.   Defendants J. LYNCH also failed to properly train and supervise custody staff regarding policies, procedures, and practices necessary for the provision of adequate mental health care, including those policies and procedures that had been ordered by the *Coleman Court.*

167.   Defendants are responsible for the promulgation of the policies and procedures and allowance of the practices/customs pursuant to which the acts of the employees of CDCR alleged herein were committed. Defendants have the ultimate authority to discipline, terminate, investigate, and transfer correctional staff and oversee, review, and approve investigations into grievances and staff complaints; she was regularly provided with reports concerning the treatment of mentally ill inmates, improper classification of inmates in the prison, suicides, and other violations involving the housing, care, mental health care, and treatment of inmates.

168.   By the actions and omissions herein, the individually named Defendants violated 42 U.S.C. § 1983, depriving Plaintiffs and Decedent of well-settled constitutional rights that are protected by the First, Fourth, Eighth, and. Fourteenth Amendments to the U.S. Constitution:

a.  Failing to provide appropriate psychiatric care and to identify suicide risk, along with the acts and/or omissions of Defendants in failing to train, supervise, and/or promulgate appropriate policies and procedures to identify suicide risk and provide psychiatric treatment, constituted objective and subjective deliberate indifference to Johnny Pantoja's serious psychiatric needs, health, and safety;

b.  The right to be free from deliberate indifference to DECEDENT's serious medical needs while in custody and confined as secured by the Eighth and Fourteenth Amendments;

c.  The right to be free from reckless disregard for the substantial risk of serious harm to DECEDENT's personal, physical safety while in custody, as secured by the Fourth, Eighth and Fourteenth Amendments;

d.  The rights and liberty interests, as an inmate, to freedom from incarceration and to timely, restorative treatment, as secured by the Fourteenth Amendment;

e.  The right to be free from wrongful government interference with familial relationships and Plaintiffs' right to companionship, society, and support under the Constitution.

169.   Defendants were on notice, and the failure of defendants caused harm to Decedent

170.   These Defendants' failure to intervene, prevent or stop the constitutional violations by others, of which each listed Defendant knew or must have known, and when each Defendant could intervene when such violations were occurring, renders Defendants liable for these violations.

171.   Defendants violated Decedent's Eighth Amendment right by withholding treatment and care when medical needs were objectively serious, and Defendants were deliberately indifferent.

172.   As a proximate result of the foregoing, DECEDENT Johnny Pantoja sustained great pain and suffering and suffered pre-death physical pain and emotional distress up to his death, loss of enjoyment of life, loss of life, and loss of earning capacity, pre-death pain and suffering.

173.    As a direct and foreseeable result of these officers' unreasonable and excessive use of force, gross indifference, and/or knowingly and deliberately failing to undertake necessary corrective action to remedy these deficiencies, Johnny died.

174.   Johnny therefore suffered special and general damages, including those arising from

FOURTH AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

Johnny's pre-death pain and suffering, along with further damages according to proof at time of trial. The conduct of Defendants was willful, wanton, malicious, and with reckless disregard for the rights and safety of Johnny warranting the imposition of punitive damages according to trial.

175.   The ESTATE OF JOHN PANTOJA claims damages as a survivor action as the loss of his right to life and of physical injuries, pain, and emotional anguish and trauma he suffered.

176.   As a result of these individual Defendants of the foregoing wrongful acts and/or omissions, Plaintiffs sustained injuries and damages, as set forth herein. Plaintiffs are therefore entitled to general and compensatory damages in an amount to be proven at trial.

177.   As a result of these individual Defendants' actions and/or inactions and deliberate indifference to the serious mental/medical health conditions and constitutional rights of Johnny, Plaintiffs suffered loss of society, comfort, companionship, love, affection, services of Decedent, their son, incurred burial and funeral expenses, and suffered and continue to suffer damages.

## THIRD CLAIM FOR RELIEF

### Americans with Disabilities Act

### (42 U.S.C. § 12101, *et seq.*)

(By Plaintiffs against all Defendants in their official capacities)

178.   Plaintiffs realleges all prior paragraphs and re-incorporate by reference as fully set herein.

179.    Plaintiffs assert this cause of action as Johnny's successor in interest.

180.    On June 17, 2022, Johnny had a disability as defined in 42 U.S.C. §12102.

181.   Title II of the ADA provides that individuals with disabilities cannot be "excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42. U.S.C. 12132.  This provision applies to services, programs, or activities". *Sheehan* v. *City & Cnty of San Francisco*, 743 3d 12 11, 1231 (9th Cir. 2014), *rev'd* in part on other grounds by *City & Cnty of San Francisco*, 575 U.S. 600 (2015).  At minimum the CDCR officers perceived Johnny as having a disability.

182.   CALIFORNIA DEPARTMENT OF REHABILITATION AND CORRECTION's prison and mental health services are places of public accommodation and are covered entities for purposes of enforcement of the ADA, 42 U.S.C. §12181(7)(F) and the Rehabilitation Act, 29

U.S.C. §794, as explicated by the regulations promulgated under each of these laws. On belief and information, CDCR and its prisons receive federal assistance and funds at all relevant times.

183.   DEFENDANTS knew or should have known Johnny to have a disability. At all material times, Decedent was a "qualified individual" with a mental illness and disability and medical impairments that limited and/or substantially limited his ability to care for himself and control his mental, medical, or physical health condition as defined under the ADA, 42 U.S.C §12131(2), and under section 504 of the Rehabilitation Act ("RA") of 1973, 29 U.S.C. §794, 28 C.F.R. 42.540(k); as such, Decedent qualified as an individual with a mental and physical disability under California law and Decedent met the essential eligibility requirements of CDCR programs to provide access to medical and mental health care services for its inmate patients in CDCR's prisons while they are in custody (for example, responding or recognizing that he was unwell), then take him for mental or physical medical treatment.

184.   Congress enacted the ADA upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem". 42 U.S.C. § 12101(a)(2).

185.   Unknown DOE Defendant CDCR employees acted aggressively toward Johnny because of his actual or perceived disability; that is, these officers discriminated due to his disability.

186.   Facially neutral policies may violate the ADA when policies unduly burden the disable.

187.    Title II of the ADA provides that the responding deputies had a duty to make reasonable accommodations in dealing with Johnny, including, for example, addressing his medical complaints. *See* 42 U.S.C. 12182(b)(2)(A). Defendant officers failed to comply with this duty.

188.   Further, CDCR, is a state, local, government, and/or department agency, thereof, both fall within the definition of "program or activity" covered by the Rehabilitation Act, 29 U.S.C. 794(b). the Rehabilitation Act of 1973 ("Section 504") provides: "No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal assistance…" 29 U.S.C. § 794(a))

189.  Defendants violated the ADA, RA, and discriminated against DECEDENT and Plaintiffs, violating their ADA, RA, and state protected rights by:

a.  Depriving Decedent of access to suicide prevention, mental health, non-solitary confinement, and other mental health or disability programs.

b.  Creating and maintaining a number of programs and services to protect the mentally disabled that operate in conjunction with the state's designated hospitals for persons who qualify under Penal Code§ 1370 (a)(2) or Welfare and Institutions Code 5150; and

c.  Failing to provide those services or to accommodate DECEDENT with access to the programs and services or State designated health hospitals and facilities for persons who qualify for services under Penal Code§ 1370 (a)(2) or Welfare and Institutions Code 5150;

d.  Defendants failed to provide services or accommodate DECEDENT as indicated and with appropriate classification and monitoring for a person in their sole and exclusive custody;

e.  Defendants failed to provide reasonable accommodations to Johnny with mental disabilities at the hospitals, clinics, and prisons and, instead, providing a quality of care and service that is different, separate, inferior, or worse than those without a disability;

f.  Depriving Johnny as a qualified individual with a disability, the opportunity to participate in or benefit from the aid, or services of CDCR, in violation of 28 C.F.R. §35.130(b)(l)(i);

g.  By reason of his disabilities, Defendants did not afford Johnny an opportunity to participate in or benefit from the aid, benefits, and services to those afforded to other non-disabled individuals by Defendants, in violation of 28 C.F.R. § 35.130(b)(l)(ii);

h.  On the basis of DECEDENT'S disability, CDCR Defendants failed to provide him an aid, benefit, or service that was as effective in affording equal opportunity to obtain the same result, to gain the same benefit, and to reach the same level of achievement as provided to other individuals in the same situation, in violation of 28 C.F .R. §35.130(b)(l)(iii);

i.  Defendants limited DECEDENT, a qualified individual with a disability, in the rights, privileges, or advantages enjoyed by others in violation of 28 C.F.R. §35.130(b)(1)(vii).

j.  By refusing or obstructing Decedent's admission to special programs, Defendants deprived him of the necessary treatment and benefits for his serious medical needs.

190.    Defendants failed to accommodate DECEDENT Johnny Pantoja with services and programs available to patients with mental health disabilities.

191.    DECEDENT was denied the benefits of the services, programs, and activities of CDCR, and was denied accommodation for his disabilities, which deprived him of safety, necessary care, mental health and medical health programs and services, which would have provided planning, delivery of treatment, follow-up, and supervision. He was mentally unwell, at risk of assault by others or self, and gravely disabled; he suffered from conditions in which a person, is unable to provide for his personal needs for food, clothing, or shelter and unable to advocate for himself; and had impairments that substantially limited one or more of his major life activities.

192.    Plaintiffs are informed and believe and thereon allege that, unless enjoined, Defendants will continue to engage in the unlawful acts and in the policies and practices described above, in violation of the legal and constitutional rights of the plaintiffs and others who are similarly situated.

193.    Plaintiffs face real and immediate threat of repeated and irreparable injury and continuing, present adverse effects due to Defendants' unlawful misconduct, policies and practices. Plaintiffs have no adequate and complete remedy at law.

194.    As a direct and foreseeable result of these deputies' actions, Johnny died.

195.    Plaintiffs therefore suffered damages, according to proof.

196.    These entities and persons are responsible for the lack of proper supervision, training, or discipline; pursuant to policy or custom; and/or the result of the lack of policy and custom, where those entities and officials responsible for condoning constitutionally-deficient conduct, and for establishing policies or customs of action or inaction that contributed to Plaintiffs' injuries. CDCR is vicariously responsible for the actions or inactions of the officers, employees and agents.

## FOURTH CLAIM FOR RELIEF

### Conspiracy to Violate Civil Rights

### (42 U.S.C. §1983 individual; §1985 conspiratorial)

(By Plaintiffs against Defendants J. LYNCH; CSP C. CAVANAUGH; CSP OFFICER R. RIOS, E. ALTVATTER, O. ODIAHI, and DOES 1 through 20)

197.    Plaintiffs incorporate the allegations of the prior paragraphs as set forth herein.

198.   Plaintiffs are informed and believes that at least two or more individuals agreed and endeavored to deprive Decedent Johnny Pantoja of his constitutional rights.

199.   CDCR Defendants permitted more than 20 staff members to descend upon Johnny's cell;

200.   There is evidence of overt acts in furtherance of that agreement that a party improperly altered, concealed or destroyed evidence, including that Defendants stated to family that critical evidence like medical records did not exist or would not be retained.

201.   Defendants were aware of Plaintiff's previous su9icide attempts and yet they acted in concert in ignoring and depriving Plaintiff of access to mental health programming.

202.   Specific acts of interfering with Plaintiff's rights were taken in further of that conspiracy.

203.   Plaintiffs are informed and believe that Defendants have covered up this alleged wrong-doing, including harming Decedent and covering up with destruction of surveillance footage, video, reports, calls, or tampering with reports.

204.   Plaintiffs are informed and believe the facility refused to provide all of Johnny's possessions including documents such as journals, correspondence, letters; blank journals were returned in pieces or ripped to shreds; witness observations, daily logs, legal documents, reports and complaints were kept by DOE Defendants.

205.   There was harm to Johnny and this was the actual and proximate cause of his death.

206.   It is unlawful for a government party or agent to alter, conceal or destroy evidence.

207.   Damages, penalties, or injunctive relief are to be proved at trial.

208.   The officers acted in the scope of their employment.

### FIFTH CLAIM FOR RELIEF

### Substantive Due Process (42 U.S.C. § 1983)

### Fourteenth Amendment – Unwarranted Interference with Familial Relations

(By Plaintiff Estate of JOHN PANTOJA against Defendants JEFFREY LYNCH; C. CAVANAUGH; CSP OFFICER R. RIOS, ERIK ALTVATTER, and DOES 1 through 20)

209.   Plaintiffs incorporate the allegations of paragraphs as thought fully set herein.

210.   As set forth in the First through Seventh Causes of Action, DECEDENT died as a result

of Defendants' deliberate indifference, conscious shocking, and tortious conduct to Johnny's serious psychiatric needs, health, and safety, violating his constitutional rights, and their failure to train, supervise and/or take other appropriate measures to prevent the acts and/or omissions that caused his untimely and wrongful death, deprived Plaintiffs of their liberty interests.

211.  Plaintiffs are informed and believes that Johnny lived with them prior to incarceration and planned to return to provide financial resources, household care, and the necessaries of life.

212.  Plaintiffs, and each of them, had a cognizable interest under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to be free from state actions that deprive them of life, liberty, or property in such a manner as to shock the conscience, including but not limited to unwarranted state interference in Decedent's familial relationship with his parents and Plaintiffs' familial relationship with their son under the Fourteenth Amendment.

213.  As a direct and proximate result of Johnny's death, Plaintiffs were deprived of their to familial companionship and society and suffered injuries and damages according to proof.

## SIXTH CLAIM FOR RELIEF

### Wrongful Death (CCP 377.60 *et seq.*)

(By Plaintiff Estate of JOHN PANTOJA against Defendants JEFFREY LYNCH; KATHLEEN ALLISON; DIANA TOCHE; AMAR MEHTA; CSP C. CAVANAUGH; CSP OFFICER R. RIOS, O. ODIAHI,  and DOES 1 through 20)

214.  Plaintiffs repeat and reallege each and every allegation in the prior paragraphs of this Complaint with same force and effect as if fully set forth herein.

215.  Defendants committed tortious acts and/or omissions or against Decedent alleged herein.

216.  Defendants had a duty to Decedent to act with care so as not to cause harm to another.

217.  The general duties of reasonable care include, but are not limited, to the following:

a.  To provide safe and appropriate prison custody for JOHN PANTOJA, including reasonable classification, monitoring, and housing, including placing him in an adequately monitored cell away from dangerous or self-injuring objects;

b.  To obey Court orders for the care and safety of inmates, such as JOHN PANTOJA;

c.  To summon necessary and appropriate medical care for Decedent;

    d.   To use generally accepted law enforcement and prison procedures that are reasonable and appropriate for Plaintiffs status as a mentally ill or emotionally disabled person;

    e.   To refrain from violating Plaintiffs' and Decedents rights guaranteed by the United States and California Constitutions, and as otherwise protected by law.

218.   By the acts and omissions set forth more fully herein, Defendants breached that duty of care which foreseeably resulted in the suffering of damages by Decedent and Plaintiffs.

219.   Under Cal. Civ. Proc. Code § 377.60 *et seq*, which is incorporated by §1988, each Plaintiffs are each authorized to bring a cause of action grounded in Johnny's wrongful death.

220.   Defendants, while acting under color of law and in the course and scope of his employment with the Defendants CDCR negligently, wantonly, or grossly indifferent inflicted multiple injuries, failed to assist and even worse, ignored his pleas, resulting in his death. Decedent died as a direct and proximate result of injuries inflicted or gross indifference to his health.

221.   Plaintiffs have suffered economic and non-economic damages. Plaintiffs are entitled to special damages and prejudgment interest. Plaintiffs lost the benefit of financial support that during the remainder of his life, or the remainder of each of Plaintiffs' lives. Plaintiffs have incurred funeral, burial expenses and damages. Plaintiffs lost the love, financial and household services.

### SEVENTH CLAIM FOR RELIEF

#### Negligence

(By Plaintiffs against All Defendants)

222.   All preceding paragraphs are incorporated as if fully set forth herein.

223.   At all material times, Defendants, to the extent under the law, owed a duty of reasonable care to the Plaintiffs, including the safety and well-being of Johnny such as providing appropriate medical care, ensuring conditions met safety standards, protecting inmates from foreseeable harm.

224.   These general duties of reasonable care and due care owed to DECEDENT by all Defendants include, but are not limited, to the following specific obligations:

    a.   To provide safe and appropriate custody and housing for JOHN PANTOJA, including reasonable classification, monitoring, and lacing him in a protected cell away from harm;

b.  To obey Court Orders for the care and safety of inmates, such as JOHN PANTOJA;

c.  To summon necessary and appropriate medical care and treatment to JOHN PANTOJA;

d.  To use and enact generally accepted procedures that are reasonable and appropriate for Plaintiff's status as a mentally ill and/or emotionally disturbed patient;

e.  Defendants fail or failed to appropriately supervise, review, and ensure the competence of provision of care, treatment and investigation by medical and custody staff, and failed to enact appropriate standards and procedures to prevent such harm.

f.  To refrain from violating Plaintiffs' rights guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

225.  By the acts and omissions set committed in the scope of employment, Defendants breached that duty of care owed, which foreseeably resulted in Plaintiffs' suffering of damages.

226.  Defendants' conduct was a substantial factor in causing Plaintiff Johnny Pantoja's harm, injury, and emotional distress, including but not limited to suffering anguish, fright, horror.

227.  As a proximate result of Defendants' negligence, Plaintiffs sustained injuries and damages, and is entitled to the relief described herein.  Plaintiffs seek punitive damages.

## EIGTH CLAIM FOR RELIEF

### Failure to Protect from Harm

### (Violation of U.S. Const. Amend. VIII; Survival Action - 42 U.S.C.§1983)

By Plaintiff Estate of JOHN PANTOJA against Defendants JEFFREY LYNCH; CSP C. CAVANAUGH; CSP OFFICER R. RIOS, O. ODIAHI, E. ALTVATTER,  and DOES 1 through 20)

228.  Plaintiffs repeat and re-allege each and every allegation in the preceding paragraphs of this Complaint with the same force and effect as if fully set herein.

229.  The denial of medical care by  JEFFREY LYNCH, individually & in his official capacity as warden;  Officer  C.  CAVANAUGH;  CSP  Nguyen;  CSP  RICARDO  RIOS;  Technician ONOMEN ODIAHI, CDCR Investigator ERIK ALTVATER, Registered Nurse Rachel Hunter, Lori Chester; DOES 1 through 20, inclusive in their official and personal/individual capacities deprived Johnny of his right to medical  care and sanctity of his person from bodily harm,

guaranteed under the Fourth or Eighth Amendment of the Constitution as applied to state actors by the Fourteenth Amendment.

230.    Defendant Secretary Lynch, and Defendant as DOES 10 through 15, were responsible for ensuring the safety and security of inmates within CDCR, including taking reasonable actions to address substantial risk of serious harm. Despite repeated notice that CDCR's policies, procedures, and practices for provision of mental health treatment and suicide prevention at CMC were inadequate, Defendants Lynch knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Johnny Pantoja.

231.    Defendant LYNCH, as Warden of CMC, was responsible for the safety and security of inmates at CMC, including taking reasonable actions to address substantial risk of serious harm. Despite repeated notice that CDCR's policies, procedures, and practices for provision of mental health treatment and suicide prevention at CMC were inadequate, Defendant LYNCH knowingly and deliberately failed to undertake necessary corrective action to remedy these deficiencies, resulting in the death of Johnny Pantoja.

232.    These Defendant prison officials, correctional officers, medical staff, or those present knew that the failure to provide timely medical treatment to Decedent could result in significant injury, unnecessary and wanton infliction of pain, or death, but instead disregarded that serious medical need, failing to provide needed medical care or reasonable steps, and disregarded or caused an excessive risk to the safety or health of Johnny, preventing the appropriate treatment.

233.    Defendants 1 through 20 knew that Johnny suffered a significant risk to his health if untreated and the failure to provide medical treatment could result in further significant injury, the unnecessary and wanton infliction of pain, or death, but disregarded the serious medical need.

234.    Each of Defendants LYNCH AND DOES 10 thorough 15, intentionally, willfully, knowingly, and deliberately failed to take reasonable and sufficient actions to implement the recommendations of the *Coleman* Special Master regarding mental health treatment and suicide prevention at CMC that were ordered by the *Coleman* Court, placing Johnny Pantoja at undue and substantial risk of harm by suicide.

235.    Defendants' actions and/or omissions as alleged herein, including but not limited to their

failure to provide Johnny Pantoja with appropriate psychiatric care and to identify suicide risk, along with the acts and/or omissions of Defendants in failing to train, supervise, and/or promulgate appropriate policies and procedures to identify suicide risk and provide psychiatric treatment, constituted gross indifference to Johnny Pantoja's serious psychiatric needs, health, and safety.

236.   The conduct of each individual Defendants was wanton, willful, malicious and reckless disregard to the rights and safety of Johnny warranting imposition of exemplary damages.

237.   Plaintiff's ESTATE is entitled to recover punitive damages against these individual Defendants, who with conscious regard of JOHN PANTOJA's rights, failed to provide him with health care services meeting the professional standard of practice, and/or failed to adhere to legal and professional standards of correctional supervision and administration.

238.   As a result of this misconduct, Defendants are liable for Decedent's injuries, either as integral participants in the injury or denial of medical care, and/or because they failed to intervene.

239.   As a direct, foreseeable result of defendants' deliberate indifference to his medical needs, Johnny suffered great physical pain, emotional distress, loss of life, loss of earning, and died.

240.   Because the officers acted in the scope of their employment Defendants are vicariously liable for harm proximately caused by the deputies' conduct pursuant to Government Code §815.2.

## NINTH CLAIM FOR RELIEF

### Violation of the Rehabilitation Act (29 U.S.C. §794(a))

(By ESTATE OF JOHN PANTOJA against CALIFORNIA DEPARTMENT OF REHABILITATION; J. LYNCH)

241.   Plaintiffs reallege all prior paragraphs of this complaint and incorporate by reference.

242.   The Rehabilitation Act of 1973 ("Section 504") provides that "No otherwise, qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794(a).

243.   CDCR programs receive federal financial assistance as defined in 29 U.S.C. § 794(b).

244.   CDCR, is a state government, department, or agency, falling within the definition of "program and activity" under the Rehabilitation Act, 29 U.S.C. Section 794(b).  CDCR is within

the mandate of the RA that no person with a disability may be "excluded from participation in, be denied the benefits of, subjected to discrimination under any program or activity." 29 U.S.C.§794.

245.    Johnny Pantoja was a "qualified individual with a disability" with a mental illness and disability that limited and/or substantially limited his ability to care for himself and control his mental, medical, or physical health condition as defined under ADA, 42 U.S.C. §123131(2), and under section 504 of the Rehabilitation Act ("RA") of 1973, 29 U.S.C. §794, 28 C.F.R 42.540.

246.   Decedent was deprived of access to suicide prevention, mental health, non-solitary confinement, wellness checks and other mental health, alternative holding cells under continuous watch,  or disability programs.

247.   Decedent was deprived of proper staffing, mental health screening, educational, vocational, and necessary court-mandated programs for his health disability.

248.   Defendants violated the Rehabilitation Act failing to make reasonable accommodations to the needs of Johnny Pantoja, a disabled person. It was a reasonable accommodation to transfer a mentally distressed patient to a health facility where he could receive necessary services.

249.    Defendant employees were deliberately indifferent to Decedent's serious medical condition. Defendants refused treatment and failed to consider obvious symptoms or risks.

250.   DOES 1 through 20 improperly, negligently, wrongfully, and recklessly failed to transport Johnny Pantoja to provide necessary medical care and expedited his brutal death.

**<u>TENTH CLAIM FOR RELIEF</u>**

**Supervisory Liability Causing Constitutional Violations**

**Failure to properly Train, Supervise, Discipline, Ratification (42 U.S.C. 1983)**

(By Plaintiff Estate of JOHN PANTOJA against Defendants

JEFFREY LYNCH; KATHLEEN ALLISON; JEFFREY MACOMBER; DIANA TOCHE;

AMAR MEHTA; and DOES 1 through 20, individually and in official capacities)

251.   Plaintiff reallege and incorporate herein by reference each of the preceding paragraphs.

252.   Based upon the principles established in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), Defendants are liable for all injuries sustained by Plaintiffs as set forth herein. To establish municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*,

FOURTH AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

436 U.S. 658 (1978), a plaintiff must prove: (1) that [the plaintiff] possessed a constitutional right of which she was deprived; (2) that the municipality had a policy/custom/practice; (3) that this policy/custom/practice amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy/custom/practice is the moving force behind the constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir, 2011). The policy/custom/practice "need only cause the constitutional violation; it need not be unconstitutional per se." *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994). Recognized paths to Monell liability include: (1) an unconstitutional custom, practice or policy behind the violation of rights; (2) a deliberately indifferent omission, such as a failure to train or failure to have a needed policy; and (3) a final policy-maker's involvement in or ratification of the conduct underlying the violation of rights. *Clouthier v. County of Contra Costa,* 591 F.3d 1232, 1249-1250 (9th Cir. 2010).

253.  As supervisors, Defendants, despite the fact that the each knew or should have known that Decedent's serious medical needs were not being lawfully addressed, and that Defendants Secretary JEFFREY MACOMBER, in his official capacity, Warden JEFFREY LYNCH in his individual and official capacity,  past Secretary KATHLEEN ALLISON in her individual capacity, Undersecretary DIANE TOCHE; Deputy Director AMAR MEHTA, and DOES 11 through 20, individually and in official capacities knew or should have known that Decedent was at grave risk of harm from the correctional officers or to himself for the reasons described herein, each failed to properly supervise and train other Defendants, hospital staff, and prison staff who were responsible to properly address Decedent's medical needs and safety, and each permitted and failed to prevent the unconstitutional acts of other Defendants and individuals under their supervision and control.. Each of these supervising Defendants either directed his or her subordinates in conduct that violated Decedent's rights, OR set in motion a series of acts and omissions by the subordinates that the supervisor knew or reasonably should have known would deprive Decedent of rights, knew the subordinates were engaging in acts likely to deprive Decedent of rights and failed to act to prevent the subordinate from engaging in such conduct, OR disregarded the consequence of a known or obvious training deficiency that s/he must have known would cause subordinates to violate Decedent's rights, and in fact did cause the violation of Decedent's rights. Furthermore,

each of these supervising Defendants is liable in their failures to intervene.

254.   Here, Defendants J. Lynch, were on notice and had policies to prevent suicide and failed to implement those court mandated suicide watch programs.

255.   In 2020 CDCR designed a next of kin notification system implemented in April of 2021. Plaintiffs are informed and believes that Defendants failed to train properly or inform their subordinates and ratified disregard of such policies.

256.   Each year, CDCR is required to submit to the California Legislature on the suicide and attempted suicide prevention measures under California Penal Code section 2064.1.

257.   Defendants had a duty to implement suicide prevention recommendations and orders such as the thirty (30) minute wellness check, policies, procedures, and training on Mental Health Services including but not limited to the Operations Manual 52080.22.3, protecting those: "who are diagnosed by qualified medical staff as a suicide risk shall be moved to a hospital or infirmary setting and medical staff shall assume placement, observation and supervision of the inmate…"

258.   CDCR has a policy and procedures that trained custody and mental health reviewers conduct an on-side visit together within seven days of a suicide and perform operations according to specific timelines in which Reviewers inspect the decedent's property, listen to recorded phone calls, check trust account records, and speak with the institutional Investigative Services Unit.

259.   Defendants had a duty to hire, supervise, train, and retain employees and/or agents so that employees and/or agents refrained from the conduct and/or omissions alleged herein.

260.   Defendants breached this duty, causing the conduct alleged herein. Such breach constituted negligent hiring, supervision, training, and retention, under the laws of California.

261.   Plaintiffs allege the unconstitutional actions and/or omissions of the individually named CDCR Defendants were pursuant to the following customs, policies, practices and/or procedures of the CDCR, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policy making officials and its staff including, but not limited to, DOES 1 through 20:

a.   To deny Johnny access to timely, appropriate, competent, and necessary care for serious medical and psychiatric needs, including, as described herein, their failure to provide appropriate and competent medical care, and failure to transfer for hospitalization;

b.  To allow and encourage officers doing regular cell checks on inmates, including inmates housed in safety cells and administrative segregation, to fail to document their observations of inmate's condition, in violation of CDCR's written policies and state law;

c.  To allow, encourage, and require medical and mental health care staff, including licensed vocational nurses and registered nurses, to work outside their legal scope of practice and without appropriate supervision;

d.  To fail to train custody staff that medical and mental health care staff, including licensed vocational nurses, are not competent to asses or decide inmates' medical conditions, medical needs, or whether the inmate should be permitted to remain in a solitary cell versus being sent to a hospital;

e.  To fail to properly classify, house, or monitor inmates suffering from mental health disabilities, including placement in separate cells, failing to clear and obvious danger of placing in cells with dangerous items without frequent, logged observation by law;

f.  To fail to institute proper procedures and training to coordinate inmate assessment, placement, protect inmates from harm, transfer to CDCR or other psychiatric facilities, and care with the prison physician, prison psychiatrist, court, and prison corrections staff where there was an obvious need for such to prevent these types that happened here;

g.  To fail to institute, require, or enforce proper and adequate training, supervision, policies, and procedures for handling, housing, caring for, or placing disabled inmates in conditions lacking monitoring and resulting in serious bodily injury and death;

h.  To allow, encourage, and require unlicensed, incompetent, inadequately trained and/or inadequately supervised medical and mental health care staff to assess inmates' medical condition needs, and treatment, including to decide whether or not to provide inmates with necessary emergency care and hospitalization, including psychiatric hospitalization.

i.  To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described herein and in subparagraphs (a) through (d), when the need for such was obvious, with deliberate indifference to the rights and safety of Plaintiffs, Decedent,

and the public, with obvious need for such policies, procedures, and training programs.

j.  All CDCR staff must learn about an inmates' high-risk periods after suffering from some form of humiliation, rejection, or abuse.

k.  All CDCR staff must conduct trainings to be alert for suicidal behavior.

l.  All CDCR custody, medical and mental health staff who recognize an inmate as being potentially suicidal are to request immediate evaluation of the patient;

m.  CDCR staff are to conduct wellness checks at regular intervals;

n.  All assessments of potentially suicidal inmates are to be conducted by qualified mental health professionals, trained to determine an inmate's suicide risk;

262.  Suicidal inmates are not to be housed alone, or left alone, unless supervision may be maintained.  If constant supervision cannot be provided when needed, the inmate should be housed with another resident or in a dormitory and monitored by video camera by custody staff.

263.  Suicidal inmates are not to be left with objects that may injure themselves.

264.  The procedures for referring potentially suicidal inmates and attempted suicides to mental health care providers or facilities should be clearly outlined.

265.  Clear, current, and accurate information regarding an inmate must be communicated between health care personnel and correctional personnel pursuant to proper procedures;

266.  Defendants may have instituted policies or training addressing topics, but with deliberate indifference to inmates, failed to properly oversee, enforce, or properly carry out.

267.  Defendants' customs, policies, practices, and/or procedures of the CDCR were a moving force or a proximate cause of the deprivations of Plaintiffs' and Decedent's rights in violation of 42 U.S.C. §1983, as set forth in the lists herein and the alleged case settlements.

268.  The unconstitutional actions and/or omissions of the individually named Defendants, CDCR personnel, were approved, tolerated, or ratified by policy making officers for the CDCR. Plaintiffs are informed and believe, and allege, the details of this incident have been revealed to the authorized policymakers within the CDCR, and that such policymakers have direct knowledge of the fact that Decedent was unlawfully denied protection, necessary care for his serious medical needs, or timely restorative treatment due to their and subordinates' violations of Plaintiffs' rights.

FOURTH AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

CDCR policymakers approved of or permitted the individually named Defendants' conduct, decisions or omissions to the extent such individuals made a deliberate, conscious and affirmative choice to endorse and ratify such conduct or decisions, resulting in the Decedent's death.

269.  As a direct-proximate result of Defendants' acts; Plaintiffs suffered damages herein.

270.  The aforementioned acts of individual Defendants were conducted with conscious disregard for the safety of Plaintiff, and were therefore malicious, wanton, and oppressive.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  That judgement be rendered in favor of Plaintiffs on all causes of action herein;

B.  Compensatory general (including economic and noneconomic damages) and special damages in accordance with proof, including wrongful death and survival damages.

C.  Exemplary damages against the individual Defendants under 42 U.S.C.§1983, federal law, and California law, in an amount deemed fair, just, and reasonable according to proof ;

D.  All damages, burial expenses, coroner's fees, reasonable attorney's fees, penalties, interests, expenses, and costs of litigation necessarily incurred pursuant to 42 U.S.C. §§ 1983, 1985, 1988, California Code of Civil Procedure §§377.20 et seq. 377.60 et seq., and 1021.5; the ADA; The RA; California Civil Code §§52 and 52.1 et *seq*., and/or any other relevant statutory or case law;

E.  Declaratory Relief of A legal declaration of Plaintiffs' rights and Defendants' obligations under 28 U.S.C. §2201, as well as Federal Rules of Civil Procedure 57, including pursuant to the Court's inherent equitable powers;

F.  For any and all other further relief in law or equity to which the Plaintiff may be entitled to, including injunctive relief to prevent future deaths, as this Court deems just or proper.

DATED: September 29, 2025                 LAW OFFICES OF EMILY E. HOWE

                                          *By s/* Emily Howe
                                          _____
                                          Emily Howe
                                          Attorneys for Plaintiffs
                                          emh@howelaws.com

*///*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands trial by jury pursuant to Fed. R. Civ. P. 38(b) of the Federal Rules of Civil Procedure and the Seventh Amendment to the U.S. Constitution.

DATED: September 29, 2025                    LAW OFFICES OF EMILY E. HOWE

                                                        *By /s/* Emily Howe
                                                        Emily Howe
                                                        Attorneys for Plaintiffs
                                                        emh@howelaws.com

FOURTH AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF